United States Court of Appeals,

Eleventh Circuit.

No. 93-9278.

ATLANTA GAS LIGHT COMPANY, Plaintiff-Appellant,

v.

AETNA CASUALTY AND SURETY COMPANY, American Home Assurance Company, American Reinsurance Company, Associated Electric & Gas Insurance Services, Ltd., Birmingham Fire Insurance Company, et al., Defendants-Appellees.

Oct. 20, 1995.

Appeal from the United States District Court for the Northern District of Georgia. (No. 1:91-cv-1803-RLV), Robert L. Vining, Jr., Chief Judge.

Before COX, Circuit Judge, FAY, Senior Circuit Judge, and NELSON[*], District Judge.

COX, Circuit Judge:

Atlanta Gas Light Company (AGL) appeals following the entry of summary judgment for thirteen insurers in this declaratory judgment action. AGL filed this action to determine the extent of its insurers' liability for environmental cleanup costs arising from twelve of its former manufactured gas plants (MGPs). Because we conclude that no justiciable controversy existed when the complaint was filed, we vacate the district court's entry of summary judgment and remand with instructions to dismiss for want of jurisdiction.

I. BACKGROUND

AGL currently is in the business of distributing natural gas in Georgia. Prior to the availability of natural gas, from the mid-1800s until sometime in the 1950s, AGL, or its predecessor

_____

[*]Honorable Edwin L. Nelson, U.S. District Judge for the Northern District of Alabama, sitting by designation.

Savannah Gas, owned and operated several MGPs in Georgia and Florida.[1] MGPs produced gas from oil, coal, pine knots, and other combustibles. Manufactured gas became obsolete with the advent of interstate pipelines in the 1950s, which made cheaper natural gas readily accessible. Because natural gas quickly became widely available, the need for MGPs disappeared, and AGL dismantled its plants or simply razed them and left the rubble on site.

Gone and perhaps forgotten, the manufactured gas industry later came back to haunt AGL. Various byproducts of the gas manufacturing process contained hazardous materials such as benzene, toluene, xylene, and cyanide. AGL's methods of disposing of these byproducts were unsophisticated. It either covered the wastes with dirt, dumped them into unlined pits, or buried them in brick containers, many of which were unsealed and later began to leak.

During their heyday, MGPs were not subject to environmental regulations. By the mid-1980s, though, MGPs had come under closer regulatory scrutiny, and AGL was aware that the wastes buried on its sites could pose environmental threats. In 1985, the United States Environmental Protection Agency (EPA), pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), commenced emergency cleanup operations at AGL's Rome, Georgia site after the then owner of the site uncovered a deposit of coal tar. In 1988, AGL paid $75,000 to reimburse the EPA for

---

[1]AGL, or in some cases Savannah Gas, which merged with AGL in 1966, owned MGPs in Orlando, Sanford, and St. Augustine, Florida, and in Athens, Augusta, Brunswick, Griffin, Macon, Rome, Savannah, Valdosta, and Waycross, Georgia. (R. 6 at 90 Ex.C.) The St. Augustine and Orlando sites are not at issue on appeal.

cleanup costs at Rome, but admitted no liability and sought no recovery from its insurers.

AGL retained environmental counsel after the EPA raised "concerns" about adverse effects from former MGP sites around the country.[2] AGL's lawyers in turn engaged a consulting firm, Law Environmental, to conduct preliminary assessments of the sites before any government agencies took formal action. Law Environmental reported to AGL that, if remediation was required, the cost would be "in excess of several million dollars." (R. 54-529 at 6.) But when AGL presented Law Environmental's findings to the Georgia Department of Natural Resources, Environmental Protection Division (GEPD), GEPD advised AGL that the sites posed no threats to public health or drinking water. As a result, AGL concluded that it was unlikely that further cleanup of the sites would be required, or that third parties would file actions for reimbursement of cleanup costs.

State and federal agencies eventually grew less tolerant of former MGP sites. In March, 1990, the EPA revised the "toxicity characteristics" used to identify hazardous wastes under the Resource Conservation and Recovery Act (RCRA), by adding benzene, a common component of MGP wastes, to the formula used to determine "toxicity" of wastes. *See* Toxicity Characteristic Revisions, 55 Fed.Reg. 11,798 (1990) (codified at 40 C.F.R. scattered pts.). The

---

[2]The EPA commissioned a national study to look into the threats to public health and the environment posed by former MGP sites. In 1985, the study, known as the Radian Report, concluded that much more research was needed to ascertain the full effects of wastes deposited at some 1500 former MGP sites around the country, including those owned by AGL.

change was significant because the new regulation made it more likely that MGP sites would be considered environmentally dangerous. By the fall of 1990, one regional EPA administrator had taken the position that MGP sites no longer qualified for exemption under RCRA, and the EPA added three MGP sites owned by other utilities to the National Priorities List (NPL) under CERCLA.[3]

In June, 1990, the current owner of AGL's Sanford, Florida site informed AGL that the Florida Department of Environmental Regulation (FDER) had completed a preliminary assessment of the site and had recommended additional screening. No cleanup was ordered, but by October, 1990, FDER had broadened its investigation of former MGPs to include twenty-three additional sites (not owned by AGL) throughout Florida.

Based on these developments, AGL concluded that it should conduct more "formal" investigations of the environmental conditions at its former MGPs. In early 1991, AGL engaged an insurance archaeologist to search for and review insurance policies that AGL had purchased since the 1940s that potentially covered environmental cleanup costs. A few of the policies afforded a modest amount of direct coverage which began at the first dollar of

---

[3]The NPL includes those environmentally hazardous sites that pose the greatest danger to public health or the environment. *See* 42 U.S.C. § 9605(a)(8) (1988). Once the EPA affirmatively includes a site on the NPL, federal "Superfund" dollars can be used for site remediation. 40 C.F.R. § 300.425(b)(1) (1994). The former MGPs at issue in this litigation have never been placed on the NPL, although other MGP sites have been listed. *See* Amendment to National Oil and Hazardous Substances Contingency Plan; National Priorities List, 48 Fed.Reg. 40,658 (1983) (adding Pine Street Barge Canal Site, Burlington, Vt.; Brodhead Creek, Stroudsberg, Pa.).

loss by AGL. [4] Most of the policies were excess comprehensive general liability policies, triggered only when AGL's self-insured retention and any underlying layers of coverage (a combined amount of up to thirty million dollars) were exhausted.

On April 16, 1991, AGL sent notice to twenty-three insurers that had issued policies to AGL of their potential liability for costs of cleanup at AGL's MGP sites. At the time, AGL's only comprehensive cleanup cost estimate—Law Environmental's 1986 figure "in excess of several million dollars"—was well below the amounts required to implicate many if not all of the excess liability policies. When AGL mailed notice to its insurers, AGL had incurred no cleanup costs for which it sought reimbursement; no environmental agency had ordered a cleanup at any of AGL's sites; and no then-owners of MGP sites, adjacent property owners, or other third parties had filed claims against AGL for recovery of any cleanup costs.[5]

II. PROCEDURAL HISTORY

This litigation began on April 17, 1991, the day after AGL mailed notice to its insurers and before the insurance companies received the notice. AGL filed a declaratory judgment action to determine the extent of its insurance coverage should cleanup costs

---

[4]Zurich Insurance Company was AGL's direct insurer, issuing policies that required no deductibles or self-insured retentions. The Zurich policies ranged from $10,000 to $25,000 of aggregate coverage. (R. 42 at 379.)

[5]Although the owner of the Sanford, Florida site had notified AGL that AGL would be a potentially responsible party with respect to any cleanup costs incurred, when AGL mailed the notice, FDER had ordered no remedial action with respect to the site.

be incurred or third party property damage actions arise because of hazardous wastes located on its former MGP sites. AGL sought judicial guidance as to both the insurers' duty to defend AGL in third party actions and their duty to indemnify AGL for losses incurred.[6]

In early 1993, after nearly two years of pretrial motions and discovery, twelve of the insurance companies[7] moved for summary judgment on the ground that AGL had given them untimely notice. They contended that AGL should have given notice after it became aware of the concerns about MGPs first raised in the 1980s. Another insurer, General Reinsurance, filed a separate motion for summary judgment asserting that the policy it issued to AGL was missing and that AGL could not prove the policy's contents through secondary evidence.

The district court made no determination as to the existence of a justiciable case or controversy;[8] it proceeded to address the

---

[6]On October 1, 1991, AGL filed an amended complaint, adding a claim for breach of contract. AGL claimed that the insurers had breached their agreement to defend AGL and indemnify its losses caused by AGL's MGP sites. AGL also based the contract claim on its allegation that the insurers had refused to honor their "obligation to defend and/or indemnify other utility companies" with respect to other MGP sites under policies like those issued to AGL. (R. 6-90 at 15-16.) On appeal, both AGL and the insurance companies refer to this case solely as a declaratory judgment action, and the record gives no hint that the contract claim was pursued beyond the allegations raised in the amended complaint. We therefore treat AGL's claim for breach of contract as abandoned and do not discuss it further.

[7]Of the twenty-three insurers originally named in the complaint, ten companies had already been dismissed at various stages of the litigation.

[8]AGL briefed the issue of justiciability for the court in July, 1993, over two years after the complaint was filed. (R. 52-502 at 7.) But the court did not address the issue before

merits of the summary judgment motions. The court found that AGL's notice to each and every one of the twelve insurers was late as a matter of law. But the court, applying Georgia law, held that proof of prejudice was required before an insurer could avoid liability due to late notice. The court found that none of the insurers had been materially prejudiced by the timing of AGL's notice and granted summary judgment only as to those few insurers that had issued policies explicitly making compliance with their notice provisions "conditions precedent" to liability.[9]

The next month, this court decided *Canadyne-Georgia Corp. v. Continental Ins. Co.,* 999 F.2d 1547 (11th Cir.1993). The district court interpreted *Canadyne* to hold that Georgia law did not require proof of prejudice for an insurer to be able to avoid liability when an insured failed to comply with policy notice provisions. The district court then modified its summary judgment order to include all the insurance companies, regardless of their ability to show prejudice or condition precedent language in AGL's policies. The court also granted summary judgment to General Reinsurance because it found that AGL had produced insufficient evidence to prove the contents of the missing policy.

The district court entered a judgment in October, 1993, which ordered that AGL "take nothing, that judgment be entered in favor of the defendants, and that the action be ... dismissed." (R. 58

proceeding to the merits of the case.

[9]The court did not examine each of the 200 policies at issue to see which ones contained condition-precedent language, but instead relied upon the parties to figure out which insurers would be granted summary judgment and which ones would have to show prejudice. (R. 54-529 at 7-8.)

at 587.) No declaratory judgment defining the rights and obligations of the parties to these insurance contracts was ever entered.[10]

III. CONTENTIONS OF THE PARTIES

AGL's principal arguments on appeal focus on the district court's conclusion that the notice to AGL's insurers was late. AGL contends that it was error for the court to conclude that notice was required under any of the subject policies when AGL only had enough information to know of "potential" exposure to liability. AGL also takes issue with the district court's conclusion that *Canadyne* interprets Georgia law to mean that insurers need not show prejudice from late notice, whether or not timely notice is made a condition precedent to liability. AGL argues that the court should have found that the timing of its notice was reasonable under the circumstances.

Apart from the notice issue, AGL attacks the district court's refusal to rule on the admissibility of evidence relied upon by the insurers in their summary judgment motions, as well as the court's disposition of AGL's discovery requests. AGL also questions the court's determination that AGL had not shown sufficient evidence for a jury to determine the terms and conditions of the lost

---

[10]The judgment tracked Fed.R.Civ.P. Form 32, which was designed to apply to cases involving claims for money damages. Such a judgment is insufficient to afford declaratory relief. If the district court meant to "declare" that AGL's insurers had no liability for these potential losses, the court should have entered an explicit declaratory judgment to that effect. *See American Inter-Fidelity Exchange v. American Re-Insurance Co.,* 17 F.3d 1018, 1020 (7th Cir.1994) (stating that when prevailing party is entitled to declaratory judgment, court must draft such judgment rather than assuming that its opinion serves that purpose).

General Reinsurance policy.  To defend their summary judgment, the insurers argue that notice was late as a matter of law and that the district court properly interpreted  *Canadyne*  in  reaching  that conclusion.

IV. DISCUSSION

We do not address the parties' contentions because, at the time AGL filed suit, no justiciable case or controversy existed between AGL and its insurers.  Any time doubt arises as to the existence of federal jurisdiction, we are obliged to address the issue before proceeding further.  *Vermeulen v. Renault, U.S.A., Inc.,* 985 F.2d 1534, 1542 (11th Cir.1993);  *see also Ashcroft v. Mattis,* 431 U.S. 171, 172, 97 S.Ct. 1739, 1740, 52 L.Ed.2d 219 (1977) (raising jurisdictional issue *sua sponte* ).  In all cases arising under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1988),[11] the threshold question is whether a justiciable controversy exists.  *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 272, 61 S.Ct. 510, 512, 85 L.Ed.2d 826 (1941); *United States Fire Ins. Co. v. Caulkins Indiantown Citrus,* 931 F.2d 744, 747 (11th Cir.1991) (citations omitted).  Congress limited federal jurisdiction under the Declaratory Judgment Act to actual controversies, in statutory recognition of the fact that federal judicial power under Article III, Section 2 of the United States Constitution extends only to concrete "cases or controversies."

---

[11]28 U.S.C. § 2201(a) provides, in relevant part:  In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought....

*See Tilley Lamp Co. v. Thacker,* 454 F.2d 805, 807-08 (5th Cir.1972).

"Whether such a controversy exists is determined on a case-by-case basis." *Caulkins Indiantown Citrus,* 931 F.2d at 747; *see also BP Chemicals v. Union Carbide Corp.,* 4 F.3d 975, 977-78 (Fed.Cir.1993) (stating that difference between "definite and concrete" dispute and case not ripe for litigation is one of degree, determined by totality of circumstances). The controversy must be more than conjectural; the case must "touch[ ] the legal relations of parties having adverse legal interests." *Caulkins Indiantown Citrus,* 931 F.2d at 747 (quoting *Brown & Root, Inc. v. Big Rock Corp.,* 383 F.2d 662, 665 (5th Cir.1967)); *see also Halder v. Standard Oil Co.,* 642 F.2d 107, 110 (5th Cir. Unit B 1981) (stating that district courts lack jurisdiction to express legal opinions based on hypothetical or academic facts).

For a controversy to exist, "the facts alleged, under all the circumstances, [must] show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co.,* 312 U.S. at 273, 61 S.Ct. at 512 (citation omitted). The party who invokes a federal court's authority must show, at an "irreducible minimum," that at the time the complaint was filed, he has suffered some actual or threatened injury resulting from the defendant's conduct, that the injury fairly can be traced to the challenged action, and that the injury is likely to be redressed by favorable court disposition. *Caulkins Indiantown Citrus,* 931 F.2d at 747 (citing *Valley Forge College v.*

*Americans United,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)).

To determine whether AGL has met this burden, we "look to the state of affairs as of the filing of the complaint; a justiciable controversy must have existed at that time." *International Harvester v. Deere & Co.,* 623 F.2d 1207, 1210 (7th Cir.1980) (citations omitted). AGL filed its complaint before the insurance companies received the notice of potential liability AGL mailed to them the previous day. The insurers not only had no chance to respond to AGL's notice before the complaint was filed, they had no knowledge that notice had been given. It is therefore difficult to understand how AGL could assert that the insurance companies had failed to defend or indemnify it for cleanup of its MGPs when the insurers had taken no position at that time with regard to their duties under AGL's policies. To support its claims, AGL's complaint asserts only that the defendant insurers denied coverage to similar utilities under similar circumstances in the past. In essence, AGL filed its complaint as an anticipatory maneuver designed to preempt whatever actions the insurers may have taken after they received AGL's notice.

Regardless of how well-founded AGL's concerns about its insurers may have been, speculation based on the insurance companies' dealings with other insureds does not present a concrete case or controversy. At the time the complaint was filed, AGL could claim neither actual nor threatened injury resulting from the insurers' conduct, nor any injury traceable to the insurance companies at all. When AGL sought the court's guidance through a

declaratory judgment, the issues it presented were no more than conjectural questions based on the fact that other utilities had battled with insurers over MGP cleanup costs.

The district court made no determination that a justiciable controversy existed when the complaint was filed; the record would not support such a finding. Not only had the insurers not yet received notice, no one knew exactly what had to be cleaned up, who was to undertake the cleanup, or how much the cleanup would cost. While it is not necessary to know each of these factors with certainty in order to seek declaratory relief, when AGL filed its complaint, it was not clear that state and federal environmental agencies would ever require cleanups at any of AGL's former MGP sites.

The record demonstrates that the regulatory climate was evolving when AGL filed suit: what actions would be required by regulators was uncertain. At the time the complaint was filed, GEPD had concluded that AGL's Georgia sites posed no threat to public health, and FDER had recommended only "additional site screening" at the Sanford, Florida site. No then-owner of an MGP site had called upon AGL to reimburse them for cleanup costs or to clean up wastes itself. No lawsuits had been filed against AGL, either by owners of former MGP sites or by adjacent property owners. With so many material facts dependent upon future contingencies, it would be impossible to resolve all the issues relative to the timeliness of notice in a way that would do justice

to the parties.[12]

In vacating the trial court's disposition of this case, we emphasize that we do not reach any issues beyond the threshold question of justiciability. Specifically, by finding that no case or controversy existed at the time the complaint was filed, we do not intimate that AGL had no responsibility under its policies to give notice of potential liability. Nothing in this opinion should be construed to suggest that a justiciable case or controversy must exist before notice obligations are triggered. Timeliness of notice is an inquiry distinct from the question of justiciability, to be determined by resort to Georgia, rather than federal, law.

V. CONCLUSION

For the foregoing reasons, we VACATE the district court's entry of summary judgment for all insurers who are parties to this appeal and REMAND to the district court with instructions to DISMISS the action as to the parties to this appeal for want of

---

[12]It appears that events that have transpired since the complaint was filed could give rise to justiciable claims with regard to some or all of AGL's former MGP sites, under some or all of AGL's insurance policies. In January, 1992, the current owner of the Sanford, Florida site actually sued AGL for recovery of response costs and damages under CERCLA. (R. 52-502 at 7.) AGL asserted in the July, 1993 brief on justiciability it filed in district court that its total liability for the Sanford site could top $47 million. (*Id.*) In May, 1992, AGL entered into four consent orders with GEPD concerning the Augusta, Griffin, Savannah, and Valdosta, Georgia sites, which require AGL to take remedial cleanup measures at those sites. AGL also has produced more detailed estimates of cleanup costs (some of them in excess of the amounts required to trigger liability under AGL's excess liability policies) for all of its former MGP sites. (*Id.*, Attach. 2 & 3.) While Fed.R.Civ.P. 15(d) permits the filing of supplemental pleadings in order to assert claims maturing after the filing of the complaint, AGL never sought leave of court to amend its pleadings, and no pleading setting forth these recent events was ever filed.

jurisdiction.

VACATED and REMANDED WITH INSTRUCTIONS TO DISMISS FOR WANT OF JURISDICTION.