FILED
United States Court of Appeals
Tenth Circuit

June 21, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

COLUMBIAN FINANCIAL
CORPORATION; CARL
MCCAFFREE,

        Plaintiffs - Appellees,

v.

BANCINSURE, INC.,

        Defendant - Appellant.

No. 10-3077

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 2:08-CV-02642-CM)**

James D. Oliver, Foulston Siefkin LLP, Overland Park, Kansas, (Keith Witten,
Gilliland & Hayes, P.A., Overland Park, Kansas, with him on the briefs), for
Defendant - Appellant.

Lyndsey J. Conrad (Micheal Thompson with her on the brief), Husch Blackwell
LLP, Kansas City, Missouri, for Plaintiffs - Appellees.

Before **MURPHY**, **HARTZ**, and **GORSUCH**, Circuit Judges.

**HARTZ**, Circuit Judge.

## I. INTRODUCTION

BancInsure, Inc. (BancInsure) appeals a declaratory judgment in favor of Columbian Financial Corporation and a former director, Carl McCaffree, (collectively, the Insureds) handed down by the United States District Court for the District of Kansas. The court held that the claims-made directors-and-officers liability policy (the Policy) issued by BancInsure covered claims made until the expiration of the Policy on May 11, 2010, even though the Kansas State Bank Commissioner had declared the bank insolvent and appointed the Federal Deposit Insurance Corporation (FDIC) as receiver on August 22, 2008.

We vacate the judgment below because the district court lacked jurisdiction when it was entered. Although there may have been an actual controversy under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), when suit was filed, no such controversy existed by the time of the district court's ruling. Only one claim had been made for which the Policy might provide coverage, and during the litigation BancInsure had stipulated that the Policy covered the claim. The parties failed to present to the district court any reason to believe that a claim against the Insureds would arise in the future that would lead to a dispute between BancInsure and the Insureds regarding coverage. Nor did they suggest any other reason why they needed a judicial construction of the Policy.

## II.  BACKGROUND

### A.    The Policy

The Policy was a claims-made policy whose term ran from May 11, 2007, to May 11, 2010, "or the date on which the Policy [wa]s effectively terminated, whichever [wa]s sooner."  Aplt. App. at 17.  Under a claims-made policy, "coverage is effective if a [covered] act is discovered and brought to the attention of the insurance company during the period of the policy, no matter when the act occurred."  *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 809 n.3 (10th Cir. 2009) (internal quotation marks omitted).  The Policy covered any claim reported to BancInsure during the policy period that was made against a Columbian officer or director for a "Wrongful Act," which meant "any actual or alleged error, misstatement, misleading statement, act or omission, or neglect or breach of duty by any Insured Person acting solely in their Insured Capacities." Aplt. App. at 16.

The Policy provision upon which the parties have focused on appeal is § X.E, which concerns the scope of coverage if Columbian is placed in receivership or otherwise ceases to engage in active banking business.  Entitled "Reorganization/Cessation of Business," the section states in relevant part:

> If after the effective date of this Policy, the Company shall cease to engage in an active banking business or cease to accept deposits for any reason, coverage shall cease as of the date of the cessation of such business, and, absent a specific written agreement to the contrary, the Company shall not be entitled to obtain the extended

> coverage provided under Section II. of the Policy.  For the purposes of this clause, the cessation of the business of banking shall include, but not be limited to, the appointment by any federal or state banking regulators of a receiver, liquidator or person in a similar capacity and any Transaction occurring at the request of any federal or state regulator.  The Company shall provide written notice of such cessation of business to the Insurer as soon as practicable together with such information as the Insurer may request.

*Id.* at 21.  The parties interpret this language rather differently.  The Insureds contend that if Columbian goes into receivership, the Policy covers all claims made through the end of the original policy period, although only for Wrongful Acts committed before the receivership.  BancInsure contends that the Policy covers only claims made (or deemed to be made) before the receivership.

Two further provisions need to be mentioned.  Under § IX.B, a claim made after the Policy terminates is treated as having been made during the policy period if Columbian provides written notice of the potential claim to BancInsure within 30 days of the end of the period.  In addition, if the Policy is canceled or not renewed, § II permits Columbian to purchase additional coverage for claims made during an Extended Reporting Period of up to three years for Wrongful Acts committed during the policy period.

## B.    The Receivership and Litigation

The operation of § X.E became relevant on August 22, 2008, when the Kansas State Bank Commissioner declared Columbian insolvent and appointed

-4-

the FDIC as its receiver. Columbian stopped accepting deposits and engaging in active banking business the same day.

Soon thereafter BancInsure received a letter dated August 28, 2008, from the FDIC, providing notice of "potential claims against the former directors and officers of [Columbian] for mismanagement of lending by the institution and for other activities which may constitute a 'wrongful act' or a 'wrongful lending act,' as defined in [the Policy]." *Id.* at 228. On September 3 an attorney representing Columbian and its officers and directors sent a letter notifying BancInsure of potential claims by the FDIC and others. And on September 18 Columbian forwarded to BancInsure a September 12 letter from the Construction Industry Laborers Training Fund (the Laborers Fund) demanding payment of $486,998.06, the amount of its uninsured deposits with Columbian on August 22. BancInsure admits that it received these notices of potential claims by both the FDIC and the Fund within 30 days of August 22.

On December 18, 2008, Columbian filed an action in federal court seeking a declaratory judgment. The complaint noted disputes between Columbian and BancInsure regarding the meaning of the Policy and asserted that "[a]n actual controversy exist[ed] between Columbian and Banc[I]nsure regarding the[ir] rights, liabilities, and duties . . . under the Policy." *Id.* at 12. Count I sought a determination that "[u]nder the terms of the Policy, coverage ceased by the appointment of a receiver, but the policy was not canceled"; "that the Policy . . .

remain[ed] in full force and effect"; and that "notice of a Claim or Wrongful Act [wa]s [timely] if such [wa]s received by BancInsure on or before May 11, 2008." *Id.* (internal quotation marks omitted). (An amended complaint extended the alleged deadline for timely notice to May 11, 2010.) Count II pleaded in the alternative that if the court treated the Policy as canceled, it should declare that Columbian had the right to purchase "an Extended Reporting Period under Section II of the Policy." *Id.* at 13.

A few months later, in early March 2009, the Laborers Fund filed a lawsuit in Missouri state court against Brian McGowan, a former officer of Columbian. After learning of the claim, BancInsure sent McGowan a letter notifying him "that the Policy include[d] no duty to defend, but d[id] include a duty to pay reasonable defense costs, and reserved its rights in regard to the claim brought by the [Laborers] Fund . . . ." *Id.* at 167. The same letter, which is not in the record, allegedly "indicated that [BancInsure] would deny coverage for the claim brought by [the Laborers] Fund against Brian McGowan, claiming that notice was not provided during the Policy Period." *Id.* at 77. In response, Columbian, now joined by McCaffree as a plaintiff, filed on April 28 a second amended complaint, which added a Count III seeking a declaration that:

> the notices of potential claims sent to BancInsure on or about September 3, 2008 and September 18, 2008 regarding potential claims filed by the FDIC, uninsured depositors, and the [Laborers] Fund were timely and that [the Insureds] are therefore entitled to

have any claims which were specifically identified in those notices treated as claims made during the Policy Period.

*Id.* at 80.

The dispute about coverage for McGowan was short-lived. On September 3, 2009, the parties stipulated that the "claim asserted against Brian McGowan" brought by the Laborers Fund in Missouri state court "[wa]s covered under the Policy." *Id.* at 167. Both the Insureds and BancInsure then filed motions for summary judgment. The district court denied BancInsure's motion and granted the Insureds' as to Count I. It ruled that "the language of the policy [was] unambiguous" and that "[t]he policy period continue[d] until May 10, 2010." *Id.* at 332. It determined that it need not address the alternative claim in Count II. And it held that the Insureds waived Count III by not preserving the issue in the pretrial order.

## III. DISCUSSION

The sole issue that we must resolve on appeal is the district court's jurisdiction. Although neither party has raised this issue, we have a duty to do so sua sponte when we notice a substantial question regarding our jurisdiction. *See Tafoya v. U.S. Dep't of Justice*, 748 F.2d 1389, 1390 (10th Cir. 1984).

The Declaratory Judgment Act provides: "In a case of *actual controversy* within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any

interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a) (emphasis added). "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III" of the United States Constitution. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007).

Article III has long been interpreted as forbidding federal courts from rendering advisory opinions. *See Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("[T]he implicit policies embodied in Article III . . . impose the rule against advisory opinions on federal courts."). To be sure, an advisory opinion may sometimes be valuable. Often two persons (or many more) disagree about what the law requires and one, or both, would be willing to incur the expense of having the courts resolve the matter. But more is required before one can invoke the authority of courts created by Article III. It is not the role of federal courts to resolve abstract issues of law. Rather, they are to review disputes arising out of specific facts when the resolution of the dispute will have practical consequences to the conduct of the parties.

Unfortunately, there is no formula to determine in every dispute whether the Article III "Case or Controversy" requirement has been satisfied. The classic attempt at a formulation in the declaratory-judgment context is set forth in *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227 (1937), which, in Justice Jackson's later words, "used the whole catalogue of familiar phrases to define and delimit

-8-

the measure of [a proper declaratory-judgment action]." *Pub. Serv. Comm'n v. Wycoff Co., Inc.*, 344 U.S. 237, 242 (1952). *Aetna* said:

> The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be *a real and substantial controversy* admitting of specific relief through a decree of a conclusive character, *as distinguished from an opinion advising what the law would be upon a hypothetical state of facts*.

*Id.* at 240–41 (emphasis added) (citations omitted). As the Supreme Court recently observed, however, "*Aetna* and the cases following it do not draw the brightest of lines between those declaratory-judgment actions that satisfy the case-or-controversy requirement and those that do not." *MedImmune, Inc.*, 549 U.S. at 127. The question comes down to "'whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, *of sufficient immediacy and reality* to warrant the issuance of a declaratory judgment.'" *Id.* (emphasis added) (quoting *Maryland Cas. Co.*, 312 U.S. at 273); *see Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1111 n.12 (10th Cir. 2010) (courts presented with declaratory-judgment actions "face the difficult task of distinguishing between actual controversies and attempts to obtain advisory opinions on the basis of hypothetical controversies" (internal quotation marks omitted)).

Nevertheless, a review of Supreme Court decisions can be quite instructive. We begin with *Aetna* itself, the first decision of the Supreme Court under the Declaratory Judgment Act and, appropriately, one involving an insurance policy,

although not, as here, a liability policy. Aetna had issued five insurance policies on Haworth's life. If the policies were in effect, Haworth could collect the cash values or his beneficiary could collect the policy amounts upon his death. The policies also provided disability benefits. Haworth presented formal claims to Aetna contending that he had become disabled and that his disability had both relieved him of the obligation to pay premiums and entitled him to receive disability payments. Aetna rejected the claims. *See Aetna*, 300 U.S. at 237–39. But instead of Haworth's bringing suit to challenge Aetna's rejection, Aetna filed an action for a declaratory judgment that Haworth was not disabled and that his policies had therefore lapsed for nonpayment. Reversing the court of appeals, the Supreme Court held that there was jurisdiction to hear the case. As the Court noted, a suit by Haworth for currently payable disability benefits undoubtedly would have been justiciable. *Id.* at 243. Yet "the character of the controversy and of the issue to be determined is essentially the same whether it is presented by the insured or by the insurer." *Id.* at 244. The fact of Haworth's disability was "a definite fact," *id.* at 243, and the parties had adopted "adverse positions with respect to their *existing* obligations." *Id.* at 242 (emphasis added). Aetna, it said, should not have to wait until Haworth sued because evidence of current facts could be lost and Aetna was, absent resolution in its favor, "compelled [presumably by state law] to maintain reserves in excess of $20,000" with respect to the policies. *Id.* at 239. In short, when the insured could file suit on identical

-10-

issues and, upon success, be entitled to payments from the insurer, the insurer can bring a declaratory-judgment action without waiting for suit by the insured, at least when the factual issues have fully matured (that is, the factual premise is not "hypothetical"), the parties have formally expressed their differences on the issue (there is a "real and substantial controversy"), and the likelihood of the insured, or his beneficiary, eventually bringing a claim is high, if not inevitable (the controversy is "of sufficient immediacy and reality").

The most recent opinion of the Supreme Court on declaratory-judgment jurisdiction adds a gloss. In *MedImmune* a patent licensee, who had continued to pay royalties for use of the patent, brought a declaratory-judgment action against the patent holder to determine whether the patent was invalid or unenforceable. 549 U.S. at 121–25. What appeared to be missing in the case was the requisite immediacy—there was little likelihood that the patent holder would ever bring suit against the licensee, because the licensee was continuing to pay royalties. Nevertheless, the Supreme Court held that there was an actual case or controversy because the licensee's payment of royalties was "coerced" by the looming threat of the licensee's having to pay treble damages if it halted payments and the patent was ultimately upheld. Avoidance of such dilemmas "was the very purpose of the Declaratory Judgment Act." *Id.* at 129.

As *Aetna* and *MedImmune* illustrate the breadth of declaratory-judgment jurisdiction, Supreme Court decisions dismissing such actions best illustrate the limits of the procedure. We summarize several of those decisions.

Perhaps the simplest case rejecting jurisdiction is *Golden v. Zwickler*, 394 U.S. 103 (1969). Zwickler brought a declaratory-judgment action challenging the constitutionality of a New York law prohibiting the distribution of anonymous literature in connection with an election campaign. But the only candidate whom Zwickler wished to criticize in anonymous literature was a candidate for Congress who had been placed on the state Supreme Court by the time of the argument before the United States Supreme Court. The Court said that "the fact that it was most unlikely that the Congressman would again be a candidate for Congress precluded a finding that there was 'sufficient immediacy and reality'" to present a case or controversy. *Id.* at 109. It rejected the notion that the importance of the constitutional issue sufficed to confer jurisdiction, stating: "It was not enough to say, as did the District Court, that nevertheless Zwickler has a 'further and far broader right to a general adjudication of unconstitutionality in his own interest as well as that of others who would with like anonymity practise free speech in a political environment.'" *Id.* at 109–10 (alternations omitted). "The constitutional question," it explained, "*must be presented in the context of a specific live grievance.*" *Id.* at 110 (emphasis added).

Two cases concerning foreign policy illustrate the need for the facts to mature before declaratory-judgment jurisdiction arises. In *Rabinowitz v. Kennedy*, 376 U.S. 605 (1964), the Court held that the petitioner attorneys were not exempt from registration under the Foreign Agents Registration Act. But it refused to consider whether the questions asked on the registration forms were proper. Noting that the forms advised registrants that government regulations allowed them to apply for waivers of inappropriate or unduly burdensome requirements, it said: "Since petitioners have made no attempt to determine which questions must be answered and how much information disclosed, this issue is not ripe for adjudication." *Id.* at 610. And in *Zemel v. Rusk*, 381 U.S. 1 (1965), the Court refused to consider Zemel's claim that he was constitutionally entitled to travel to Cuba. The Court explained that it would need to know the specifics of the travel:

> The complaint filed in this case does not specify the sort of travel to Cuba appellant has in mind—e.g., whether he plans to proceed to Cuba directly or travel there via one or more other countries. Nor can we tell from the papers filed whether the Government will, in the event appellant journeys to Cuba, charge him under § 215(b) with leaving the United States on a carrier bound for Cuba with a passport not validated for Cuba; leaving the United States with such a passport with the intent of traveling to Cuba before he returns home; leaving the United States with such a passport on a journey which in fact takes him to Cuba; re-entering the United States with such a passport after having visited Cuba; some other act—or whether it will charge him at all. Whether each or any of these gradations of fact or charge would make a difference as to criminal liability is an issue on which the District Court wisely took no position. Nor do we. For if we are to avoid rendering a series of advisory opinions,

adjudication of the reach and constitutionality of § 215(b) must await a concrete fact situation.

*Id.* at 19–20.

Moreover, even if all the relevant facts regarding a particular legal issue are known or knowable, a court does not have jurisdiction to resolve the issue unless that issue arises in a specific dispute having real-world consequences. In *Coffman v. Breeze Corporations, Inc.*, 323 U.S. 316 (1945), the Court considered a declaratory-judgment action challenging the constitutionality of the Royalty Adjustment Act. Coffman, the owner of a patent, licensed Breeze's predecessor to sell the patented device at a 6% royalty. *See id.* at 319. Breeze then entered into a contract to supply the device to the government. *See id.* The Royalty Adjustment Act permitted the government to reduce the royalty rate on products it purchased when it determined that the rate was unreasonable; the licensee who sold the products to the government was not to pay the excess royalty to the licensor, could not charge the government for the excess, and was protected against suit from the patent holder. *See id.* at 319–20. The licensor could, however, recover the unpaid royalties by suing the United States. *See id.* at 320. The government had reduced the royalty rate owed by Breeze to Coffman and had ordered Breeze to pay the excess to the Treasury. *See id.* at 321. Coffman had brought a separate action against Breeze for an accounting for the royalties owed. *See id.* The suit before the Court sought a declaration of unconstitutionality of

-14-

the Royalty Adjustment Act and of the order under that Act that Breeze pay

excess royalties to the Treasury. *See id.* at 321–22. But the Court refused to

resolve the constitutional issue because no case or controversy was presented. *Id.*

at 322. The Court explained that "the constitutionality of the Act is without legal

significance and can involve no justiciable question unless and until [Coffman]

seeks recovery of the royalties, and then only if [Breeze] relies on the Act as a

defense." *Id.* at 324. The complaint merely sought "an advisory opinion as to the

validity of the defense to a suit for recovery of the royalties." *Id.*

> [Breeze] could have made such a defense but does not appear to have
> done so in the pending accounting suit and does not assert its validity
> here. The bill of complaint thus fails to disclose any ground for the
> determination of any question of law or fact which could be the basis
> of a judgment adjudicating the rights of the parties.

*Id.*

Similarly, *Eccles v. Peoples Bank*, 333 U.S. 426 (1948), held that a

declaratory-judgment action was not ripe. The Bank sought to challenge a

condition imposed on its membership in the Federal Reserve System that

restricted ownership of its stock by Transamerica Corp. Transamerica had

acquired a few shares of stock but only for investment, not to obtain any control

over the Bank, which was what the membership condition was meant to prevent.

*See id.* 430–31. Apparently, the concern that caused the Bank to file suit was that

the Federal Deposit Insurance Corporation had said that if the Bank lost its

membership, its deposits would not be insured. *See id.* at 427. When suit was

-15-

brought, however, the Bank had failed to show "*[t]he actuality of [its] need for a declaration of [its] rights*." *Id.* at 432 (emphasis added). The Federal Reserve Board had "disavow[ed] any action to terminate the Bank's membership" under the existing circumstances. *Id.* As the Court described the suit:

> [T]he Bank seeks a declaration of its rights if it should lose its independence [from Transamerica], or if the Board of Governors should reverse its policy and seek to invoke the condition even though the Bank remains independent and if then the Directors of the Federal Deposit Insurance Corporation should not change their policy not to grant deposit insurance to the Bank as a non-member of the Federal Reserve System.

*Id.* In the Court's view, "The concurrence of these contingent events, necessary for injury to be realized, is too speculative to warrant anticipatory judicial determinations." *Id.* It concluded, "[The] Bank's grievance here is too remote and insubstantial, too speculative in nature, to justify an injunction against the Board of Governors, and therefore equally inappropriate for a declaration of rights." *Id.* at 434. The Bank's desire to rid itself of an obnoxious condition on its Federal Reserve System membership was not enough in itself to support jurisdiction.

Another early decision holding that there was no jurisdiction to hear a declaratory-judgment action was *Public Service Commission of Utah v. Wycoff*, 344 U.S. 237. Wycoff alleged that he engaged in "a course of importing, processing and transporting picture film and newsreels" and that their "carriage between points in Utah was so integrated with their interstate movement that the

whole constituted interstate commerce," which was not subject to regulation by the Commission. *Id.* at 239. The trial court had found, however, that the Commission had not interfered or threatened to interfere with the within-state transportation of the materials. *See id.* at 240. The Supreme Court therefore held that the lower courts had improperly considered the case, saying: "The disagreement must not be nebulous or contingent but must have taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and *some useful purpose to be achieved in deciding them*." *Id.* at 244 (emphasis added). The case before it fell far short:

> The complainant in this case does not request an adjudication that it has a right to do, or to have, anything in particular. It does not ask a judgment that the Commission is without power to enter any specific order or take any concrete regulatory step. It seeks simply to establish that, as presently conducted, [its] carriage of goods between points within as well as without Utah is all interstate commerce. *One naturally asks, so what?*

*Id.* (emphasis added). The Court made clear that generally one cannot bring a declaratory-judgment action just to resolve one isolated issue in a possible future controversy. A declaratory judgment that would not have practical consequences without later additional litigation is not proper. The Court wrote:

> The carrier's idea seems to be that it can now establish the major premise of an exemption, not as an incident of any present declaration of any specific right or immunity, but to hold in readiness for use should the Commission at any future time attempt to apply any part of a complicated regulatory statute to it. . . . If there is any risk of suffering penalty, liability or prosecution, which a declaration would avoid, it is not pointed out to us. If and when the State

-17-

Commission takes some action that raises an issue of its power, *some further declaration would be necessary to any complete relief. . . .*

*Id.* at 245–46 (emphasis added). The Court summed up: "[W]hen the request is not for ultimate determination of rights but for preliminary findings and conclusions intended to fortify the litigant against future regulation, it would be a rare case in which the relief should be granted." *Id.* at 246.

The Supreme Court followed these precedents in its most recent decision rejecting declaratory-judgment jurisdiction. In *Calderon v. Ashmus*, 523 U.S. 740 (1998), a California state prisoner sought to bring a class action establishing that the State had not satisfied the conditions to qualify for certain procedural advantages in federal habeas litigation provided by the Antiterrorism and Effective Death Penalty Act of 1996. In particular, the prisoner wished to establish that prisoners were entitled to the ordinary one-year limitations period for bringing federal habeas actions, rather than the 180-day period that would apply if the State met the statutory conditions. The Ninth Circuit ruled that "the case-or-controversy requirement was satisfied . . . because the State's threats to invoke [the 180-day limitations period] will significantly affect the plaintiff-class's ability to obtain habeas corpus review by a federal court." *Id.* at 744 (internal quotation marks omitted). But the Supreme Court rejected the view that this legal issue could properly be characterized as a "controversy." The "underlying 'controversy' between petitioners and [the prisoner]," it said, "is

whether [the prisoner] is entitled to federal habeas relief setting aside his sentence or conviction obtained in the California courts." *Id.* at 746. It was not proper to limit the declaratory-judgment action to only one issue, however important, in that controversy. No "final or conclusive determination [of whether the prisoner was entitled to habeas relief] was sought in this action. Instead, [the prisoner] carved out of that claim only the question whether, when he sought habeas relief, California would be governed by [special provisions for which the State must qualify]." *Id.*

> As in *Coffman*, [the prisoner] here seeks a declaratory judgment as to the validity of a defense the State may, or may not, raise in a habeas proceeding. Such a suit does not merely allow the resolution of a 'case or controversy' in an alternative format, as in *Aetna*, but rather attempts to gain a litigation advantage by obtaining an advance ruling on an affirmative defense . . . . Any judgment in this action thus would not resolve the entire case or controversy as to any [prisoner], but would merely determine a collateral legal issue governing certain aspects of their pending or future suits.

*Id.* at 747. The Court said that the case before it "illustrates *the need . . . to prevent federal-court litigants from seeking by declaratory judgment to litigate a single issue in a dispute that must await another lawsuit for complete resolution*." *Id.* at 748 (emphasis added).

Turning to the case before this court, there appears to have been the necessary "actual controversy" when Columbian initially filed suit. A claim had been made against a Columbian officer, and BancInsure initially disclaimed coverage. But the actual controversy must exist not only at the time that the

-19-

complaint is filed; it must continue until the district court issues its declaratory judgment. As a leading treatise states: "The presence of a controversy must be measured at the time the court acts. It is not enough that there may have been a controversy when the action was commenced if subsequent events have put an end to the controversy, or if the opposing party disclaims the assertion of countervailing rights." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2757, at 495–96 (3d ed. 1998); *see Prier v. Steed*, 456 F.3d 1209, 1213 (10th Cir. 2006) ("Actions under the Declaratory Judgment Act must comport with the same mootness principles as any other suit," and "[t]he crucial question [in determining mootness] is whether granting a present determination of the issues offered will have some effect in the real world." (ellipses and internal quotation marks omitted)).

The problem in this case is that by the time of judgment, BancInsure had agreed that the Policy covered the only claim that had been made against an insured, the claim against former Columbian officer McGowan. Absent another identifiable claim against Columbian, there was no actual controversy to be resolved in the declaratory-judgment action.

The issue that the parties wish this court to resolve boils down to when notice of a claim must be given by an insured for BancInsure to have an obligation to indemnify it against loss. BancInsure asserts that notice must have been given within 30 days of the initiation of the receivership. The Insureds

-20-

contend that notice could be given up to 30 days after the expiration of the original term of the policy (which, perhaps, could be extended further). But as the Supreme Court asked in *Wycoff*, "so what?" 344 U.S. at 244. What "useful purpose [would] be achieved in deciding" this issue? *Id.* From what the parties have presented to us, the only matter of practical consequence is whether BancInsure will indemnify Columbian against a liability claim. But they have failed to identify any claim on which they disagree regarding the right to indemnification. Perhaps some claim may still arise. But we cannot know now the specific facts relevant to indemnification. As in *Rabinowitz* and *Zemel*, the factual predicate for a potential indemnification claim is too uncertain to permit judicial intervention; no claim has "taken on fixed and final shape." *Wycoff*, 344 U.S. at 244. And, as in *Coffman*, *Eccles*, and *Wycoff*, the issue that the parties wish us to resolve may be irrelevant to a future dispute—because, for instance, other policy provisions may require or disallow indemnification. (The parties may even agree that, based on those other provisions, there is or is not coverage—as they ultimately agreed that there was coverage for the claim against McGowan.) A declaration of rights in this case would not provide complete relief to either party in the event of a future claim against Columbian for which it sought indemnification from BancInsure. As stated in *Calderon*, we "need . . . to prevent federal-court litigants from seeking by declaratory judgment to litigate a single issue in a dispute that must await another lawsuit for complete resolution."

523 U.S. at 748. We will not allow a party to invoke our jurisdiction simply "to gain a litigation advantage by obtaining an advance ruling on an affirmative defense" or an element of its cause of action. *Id.* at 747. This is not a case in which resolution of the legal issue presented by the parties would "require[] an immediate and significant change in the [parties'] conduct of their affairs." *Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967).

To be sure, the question posed by the parties might be characterized as whether the Policy terminated when the receivership was instituted, and in *Aetna* the Supreme Court held that there was jurisdiction to hear a declaratory-judgment action regarding whether Haworth's life-insurance policies were still in force. But in *Aetna* Haworth had filed a formal claim, all relevant facts had occurred, and the declaratory judgment would have immediate practical consequences: If he won, Haworth would be entitled to receive disability payments and have a right to be paid the cash value of his policies; and if Aetna won, it would be relieved of the requirement of maintaining a reserve with respect to the policies. Here, neither party has asserted that any such consequence would necessarily result from our decision. In particular, BancInsure has not suggested that a decision would affect what reserves it would be legally required to maintain; and Columbian has not asserted that BancInsure's position has required Columbian to purchase insurance coverage that it believed to be already provided by the BancInsure policy.

-22-

Neither party has cited to us, nor has our research discovered, any declaratory-judgment action in federal court to construe the coverage of a liability-insurance policy in which the insured has failed to identify a specific claim or potential claim against it. True, the injured party may not yet have sued the insured. *See*, *e.g.*, *Aetna Cas. & Sur. Co. v. Gen. Dynamics Corp.*, 968 F.2d 707, 711 (8th Cir. 1992) (jurisdiction present even though insured had not yet been sued with respect to several potential claims because insured "had made a clear demand for payment of defense and indemnity costs" and insurer "disputed those demands"); *Firemen's Ins. Co. v. Kline & Son Cement Repair, Inc.*, 474 F. Supp. 2d 779, 786 (E.D. Va. 2007) (court had jurisdiction in declaratory-judgment action brought by insurer even though insured had not yet been sued because injured party had been pursuing a claim, and facts relevant to coverage had been stipulated to by insured and insurer); *Icarom, PLC v. Howard Cnty., Md.*, 904 F. Supp. 454, 458 (D. Md. 1995) (coverage dispute regarding future claims was ripe because "[a]ll the salient facts establishing a right to declaratory relief ha[d] already occurred," several injured third parties had submitted claims, and settlement negotiations with seven injured parties had begun); *T.H.E. Ins. Co. v. Dowdy's Amusement Park*, 820 F. Supp. 238, 240 (E.D.N.C. 1993) (suit had not been filed against insured, but injured party had retained attorney who gave insurer notice of intent to pursue a claim; failure to resolve coverage would affect settlement discussions and investigation of claims); *State Farm Mut. Auto. Ins.*

-23-

*Co. v. Sampson*, 305 F. Supp. 50, 52 (M.D. Fla. 1969) (lack of a pending claim by injured parties was not a barrier to jurisdiction because it was "obvious that suit [was] imminent pending the outcome of this litigation"); *Manhattan Fire & Marine Ins. Co. v. Nassau Estates II*, 217 F. Supp. 196, 198 (D.N.J. 1963) (jurisdiction present even though injured party had not yet sued insured because the insurer was "on actual notice of the occurrence of the accident, and of the severity of the injuries," and insurer could otherwise be put to an unnecessary burden of investigating the accident). *But cf. Union Ins. Co. v. Soleil Group, Inc.*, 465 F. Supp.2d. 567, 573–75 (D.S.C. 2006) (insurer's duty to defend cannot be determined until complaint filed so that allegations can be compared to policy language); *Georgia Am. Ins. Co. v. Johnson*, 712 F. Supp. 530, 532 (S.D. Miss. 1989) (insurer's declaratory-judgment action was premature because the injured father of insured had not filed suit against insured and it was "only conjecture as to whether any suit w[ould] be filed"); *AMCO Ins. Co. v. Western Drug, Inc.*, 2008 WL 4368929, at *2 (D. Ariz. Sept. 24, 2008) (unpublished) (declaratory-judgment action dismissed; U.S. attorney had written insured a letter threatening civil suit, but more than year had passed without a suit and no settlement negotiations were underway).

But the *sine qua non* is an identifiable specific claim that has risen above the horizon. *Cf. Olin Corp. v. Consol. Aluminum Corp.*, 5 F.3d 10, 17 (2d Cir. 1993) (declaratory-judgment action to determine whether seller of hazardous-

waste site must indemnify buyer for environmental liability arising from sites owned by third parties where waste from purchased site was disposed of; issue not ripe because the record made "no mention of any pending environmental claim as to any third-party site"); *Am. Commercial Barge Line Co. v. Monsanto Co.* (*In re Am. Commercial Lines, Inc.*), 781 F.2d 114, 116 (8th Cir. 1985) (plaintiff sought declaratory judgment that defendant barge company must indemnify it if plaintiff was held liable for third-party injuries stemming from barge accident; no actual controversy because no "substantial probability" that a claim would be brought against plaintiff).

Moreover, even if a claim can be identified, there must be a disagreement about coverage. The decision in *Atlanta Gas Light Co. v. Aetna Casualty & Surety Co.*, 68 F.3d 409 (11th Cir. 1995), is illustrative. Atlanta Gas Light Company (AGL) filed a declaratory-judgment action "to determine the extent of its insurers' liability for environmental cleanup costs arising from twelve of its former manufactured gas plants." *Id.* at 411. The day before filing the declaratory-judgment action, AGL had sent notice to 23 insurers of their potential liability for costs of cleaning up its former sites. *See id.* At the time of this notice, however, no one had filed a claim against AGL, nor had any government agency ordered a clean-up. And the insurers had taken no position on their duties under the policies should future claims be brought. The court held that no actual controversy existed when the complaint was filed, explaining:

AGL filed its complaint before the insurance companies received the notice of potential liability AGL mailed to them the previous day. The insurers not only had no chance to respond to AGL's notice before the complaint was filed, they had no knowledge that notice had been given. *It is therefore difficult to understand how AGL could assert that the insurance companies had failed to defend or indemnify it for cleanup of its MGPs when the insurers had taken no position at that time with regard to their duties under AGL's policies.* To support its claims, AGL's complaint asserts only that the defendant insurers denied coverage to similar utilities under similar circumstances in the past. In essence, AGL filed its complaint as an anticipatory maneuver designed to preempt whatever actions the insurers may have taken after they received AGL's notice.

Regardless of how well-founded AGL's concerns about its insurers may have been, speculation based on the insurance companies' dealings with other insureds does not present a concrete case or controversy. At the time the complaint was filed, AGL could claim neither actual nor threatened injury resulting from the insurers' conduct, nor any injury traceable to the insurance companies at all. When AGL sought the court's guidance through a declaratory judgment, the issues it presented were no more than conjectural questions based on the fact that other utilities had battled with insurers over . . . cleanup costs.

*Id.* at 414–15 (emphasis added); *see Solo Cup Co. v. Fed. Ins. Co.*, 619 F.2d 1178, 1189 (7th Cir. 1980) ("The mere possibility that proceedings might be commenced against an insured regarding an act of the insured's *as to which the insurer might contest coverage*, is not sufficient to create a controversy within the meaning of the Declaratory Judgment Act or Article III of the Constitution." (emphasis added)); *cf. U.S. Fire Ins. Co. v. Caulkins Indiantown Citrus Co.*, 931 F.2d 744, 747–49 (11th Cir. 1991) (settlement agreement in which insurer agreed

to defend and indemnify insured deprived court of jurisdiction over declaratory-judgment action to construe the policy).

The lack of an actual controversy in this case is even clearer than in *Atlanta Gas Light*. In that case the court held that it was not enough that the insurers had *denied* coverage in allegedly similar cases because they had not denied coverage to AGL. Here, in stark contrast, the insurer, BancInsure, had *conceded* coverage in the only comparable situation, the claim against former officer McGowan. The parties provided no reason to believe that BancInsure would deny coverage with respect to any claim described in the notices to BancInsure sent within 30 days of the receivership, and no reason to believe that a claim against an insured would be made that was not described in one of the notices. On the contrary, in response to the Insureds' interrogatories, BancInsure stated that a claim brought "by a deposit insurance organization acting as receiver" of Columbian would be covered if "notice of a potential claim was provided to BancInsure within thirty (30) days following the end of the Policy Period," Aplt. App. at 262, and it stipulated that it had received written notice of potential FDIC claims within 30 days of August 22, 2008. Accordingly, we hold that there was no actual controversy between the parties when judgment was entered and that the district court therefore lacked jurisdiction.

We recognize that both parties contend that the district court had jurisdiction to enter its judgment. They apparently desire a judicial construction

of the Policy regarding the meaning of "coverage shall cease" in § X.E and, perhaps, regarding an insured's right to purchase extended coverage after a receivership. But, to repeat what the Supreme Court said in *Aetna*, an actual controversy exists only when the parties "ha[ve] taken adverse positions with respect to their existing obligations." 300 U.S. at 242. The "obligation" at issue here is the obligation to provide coverage; as long as there is no real dispute that BancInsure would provide coverage for any foreseeable claim because of the language in § IX.B (providing a 30-day grace period), it is irrelevant whether § X.E would or would not also result in coverage. The meaning of that provision would not affect BancInsure's "obligation."[1]

## IV.  CONCLUSION

We REVERSE and REMAND to the district court with instructions to vacate its judgment.

---

[1]We also note that even if we had jurisdiction, we would not address whether Columbian had a right to purchase extended coverage under § II. Neither party appealed the district court's refusal to address this issue. And the issue that BancInsure did raise—the meaning of the cessation-of-coverage language in § X.E—is irrelevant to whether Columbian is entitled to purchase extended coverage.

10-3077, *Columbian Financial Co. v. Bancinsure, Inc.*

**GORSUCH, J**., concurring.

I agree we lack jurisdiction for two reasons. First, the parties haven't offered any evidence suggesting that a judicial decision resolving their dispute would make any difference to either of them. Unlike the insurer in *Aetna*, for example, Bancinsure hasn't argued that it requires a judicial resolution to determine the level of reserves it must maintain. 300 U.S. at 239. For its part, Columbian hasn't claimed that it had to purchase fallback coverage or suffered any other harm due to Bancinsure's purported cancellation of the policy. In fact, and despite having fought the matter past summary judgment, neither party has shown *any* harm it is suffering (or has suffered) as a result of their differing contract interpretations — no lost business opportunity, no actual or potential expense, no emotional distress, not even the risk of a sleepless night. Without a record suggesting *something* is at stake in the outcome of this suit for the litigants, this case lacks a "substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc.*, 549 U.S. at 127. Of course, this hardly means we *never* have jurisdiction to settle insurance policy disputes unless and until losses are incurred or claims arise. No doubt a future plaintiff could — and likely could easily — show some harm resulting from a disagreement about whether he remains covered (or liable) for future losses, and do so well before any putatively insured loss or claim occurs.

And under *Aetna* such a dispute would be "manifestly susceptible of judicial determination" under Article III because it would call "for an adjudication of present right upon established facts." 300 U.S. at 242. The lack of a substantial and immediate controversy in this case is thus essentially peculiar to the proof the parties have — or, really, haven't — presented in this case.

Second, there exists an even narrower reason why this case must be dismissed. Even assuming the district court *had* faced a justiciable Article III case or controversy when it granted summary judgment, any such dispute appears to have become moot during the pendency of this appeal. In December 2009, the district court issued a declaration that the policy's coverage remained in effect until its stated expiration date of May 11, 2010. But by the time oral argument in this court took place, that date had come and gone. And at oral argument both sides conceded that *no* claims had been filed during the policy period and on which they disagreed about Bancinsure's insurance obligations. Neither have the parties suggested in their appellate briefs any way in which a decision by this court about the propriety of the district court's declaratory judgment would make a difference to them now that the policy period has passed uneventfully. *See* Fed. R. App. P. 28(a)(4)(B) & 28(b)(1) (requiring parties to set forth a factual basis establishing appellate jurisdiction); *United States v. Bustillos*, 31 F.3d 931, 933 (10th Cir. 1994) (noting that the "facts supporting jurisdiction must be affirmatively alleged"). All this means that even if a live dispute once existed,

the parties have failed their obligation to show that it remains live now, rather than having come and gone, mooted by the march of time.  The parties' failure to do so, their failure to present a continuing basis for this court's appellate jurisdiction, stands as an independent basis for dismissing this case.  *See Wyoming v. Dep't of the Interior*, 587 F.3d 1245, 1254 (10th Cir. 2009).