**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 5, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CELLPORT SYSTEMS, INC.,

      Plaintiff  - Appellant/Cross-
      Appellee,

v.

PEIKER ACUSTIC GMBH & CO. KG,

      Defendant  - Appellee/Cross-
      Appellant.

Nos. 13-1029 & 13-1046

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:09-CV-01007-RBJ-MJW)**

---

Katherine L. Pringle, Friedman, Kaplan, Seiler & Adelman LLP, New York, New York (Jennifer P. Krakowsky, Friedman, Kaplan, Seiler & Adelman LLP, and Bradley M. Knepper and Todd P. Blakely, Sheridan Ross P.C., Denver, Colorado, with her on the briefs), for the Plaintiff–Appellant/Cross-Appellee.

Timothy P. Getzoff, Holland & Hart, LLP, Boulder, Colorado (Christopher H. Toll, Holland & Hart, LLP, Greenwood Village, Colorado, Marcy G. Glenn, Holland & Hart, LLP, Denver, Colorado, and Michael P. Manning, Holland & Hart, LLP, Billings, Montana, with him on the briefs) for the Defendant–Appellee/Cross-Appellant.

---

Before **LUCERO**, **SEYMOUR**, and **TYMKOVICH**, Circuit Judges.

---

**LUCERO**, Circuit Judge.

In October 2004, Cellport Systems, Inc. ("Cellport") and Peiker Acustic GMBH & Co. KG ("Peiker") entered into an agreement concerning Cellport's technology for the hands-free use of cellphones in vehicles. In 2009, Cellport filed suit against Peiker, alleging breach of that agreement and seeking royalties for seven Peiker products. The district court awarded Cellport royalties on only two of the products, interpreting an acknowledgment in the license agreement as "a rebuttable presumption." Cellport appealed, and Peiker filed a conditional cross-appeal. We affirm in part, reverse in part, and remand.

**I**

Cellport, a Colorado corporation, designed technology that allows vehicle owners to connect different cellphone models to a single hands-free system—typically a docking station that charges the phone, connects to a vehicle's external antenna, and allows the phone to be operated in a hands-free manner—through specialized "Pockets." Peiker, a corporation organized under the laws of Germany, develops and sells products for the hands-free use of cellphones. In August 2001, Cellport and Peiker entered into an agreement granting Peiker a nonexclusive license to intellectual property owned by Cellport. That agreement enabled Peiker to manufacture the universal phone systems that Cellport invented, and prohibited Peiker from otherwise competing with Cellport. After Cellport filed a lawsuit alleging breach of the 2001 agreement, the parties reached an interim settlement and came to terms on a second license agreement (the "License Agreement") in October 2004.

Pursuant to the License Agreement, Peiker must pay royalties for products that use Cellport's intellectual property. Specifically, royalties are required for each "Docking Station," "Pocket," or "Universal Mobile Connectivity Product" Peiker sells, as such terms are defined by the agreement.[1]

---

[1] The License Agreement defines the terms as follows:

1.5 Docking Station. "Docking Station" means the components of a Universal Mobile Connectivity Product, which utilizes Pockets, other than the Pocket. The Docking Station interfaces with vehicle resources, such as power, radio, antenna and/or other vehicle electronics, either directly or otherwise, for example by connecting to a vehicle bust and also interfaces, either directly or through a Docking Plate, with a Pocket. When the Docking Station interfaces with the Pocket through a Docking Plate, it is sometimes referred to as a "TCU" or "telematics control unit."
. . . .
1.13 Pocket. A "Pocket" is an interchangeable component of a Universal Mobile Connectivity Product that includes a separate Docking Station. The Pocket holds the portable wireless device and establishes connectivity with vehicle resources by connecting either to such Docking Station directly or through a Docking Plate.
. . . .
1.17 Universal Mobile Connectivity Products. "Universal Mobile Connectivity Products" means (i) systems, devices or sets of components for using portable wireless devices in vehicles, that work with more than one make or model of portable wireless device by substituting interchangeable Pockets that establish a physical, electrical and/or logical interface for the portable device to the remaining components of the system, and consisting of a Pocket/Docking Station configuration, Pocket/Docking Plate/Docking Station configuration, or Pocket/Docking Plate/TCU configuration, which the Parties acknowledge utilize technology, designs or architectures covered by one or more of the claims included in the Licensed Patents, . . . or (iii) any other systems, devices or sets of components for using portable wireless devices in vehicles, or any one or more elements or components thereof, which utilize technology, designs or architectures covered by one or more of the claims included in the Licensed Patents.

- 3 -

In 2009, in the Colorado District Court for Boulder County, Cellport again filed suit against Peiker. An amended complaint alleged that Peiker breached section 3.1 of the License Agreement, which requires Peiker to pay a royalty based on the number of products "sold, distributed or delivered," and section 3.3 of the License Agreement, which obligates Peiker to maintain and share with Cellport a complete accounting of the products sold, distributed, and delivered. Peiker removed the suit to federal court. Before trial, the district court recognized that the parties had "a fundamental disagreement about the scope of the" License Agreement. Whereas Peiker argued that Cellport could claim royalties under the License Agreement only on products that practiced Cellport's patents, Cellport contended that it was "entitled to royalties on the sale of 'Licensed Products,'" and that no patent infringement analysis was required by the contract.

Cellport asserted breach by Peiker with respect to seven products: the CKII and CKIV pockets sold to Daimler, the CKII/CIB system sold to Volkswagen, the CKII/CIB system sold to BMW, the CKVI system sold to Audi, the Bluetooth Peiker System Connector ("BT-PSC"), and the Snap-in Adaptor/Baseplate system ("SIAB").[2] The district court concluded that a list of relevant patent claims that Cellport also filed "defined the battleground of this case so far as the patent issues are concerned." That list includes:

---

Royalties are also required to be paid for "Uniphones," but the parties agree that Uniphones are not at issue in the present litigation.

[2] We use the parties' terminology to refer to these products.

1. Claim 9 of United States Patent 6,341,218 entitled "Supporting and Connecting a Portable Phone," issued December 6, 1999.

2. Claim[s] 8, 9, 10 and 21 of United States Patent 6,377,825 entitled "Hands-Free Wireless Communication in a Vehicle," issued April 23, 2002.

3. Claims 1, 2, 5, 6, 8, 9, and 12 of European Patent EP 1266456 entitled "HANDS-FREE WIRELESS COMMUNICATION IN A VEHICLE."

After a bench trial, the district court concluded that Peiker owed Cellport royalties on the CKII and CKIV pockets sold to Daimler. It ruled that subsection 1.17(i) of the License Agreement, which sets forth a definition of Universal Mobile Connectivity Products, applied to the CKII/CIB system made for Volkswagen, following Peiker's concession on the matter. But Peiker, the court determined, could "rebut" the acknowledgement in the License Agreement that such products "utilize technology, designs or architectures covered by" Cellport's intellectual property. It concluded that Peiker had carried its burden to demonstrate that the system did not practice Cellport's patents. Because the CKII/CIB system sold to BMW was substantially similar to the product sold to Volkswagen, the district court stated that it made "no sense to rule one way on the Volkswagen product and another on the BMW product." For the fifth product, the CKVI sold to Audi, the district court did not consider whether the product fell within subsection 1.17(i), instead finding "Peiker's evidence that [the product] does not use technology covered by any Cellport patent to be persuasive."

As to the two remaining products—the BT-PSC and the SIAB—the district court concluded that they did not fall within the meaning of subsection 1.17(i) but could be encompassed within subsection 1.17(iii) if Cellport proved that the products infringed

Cellport's patents. The court determined that the BT-PSC lacked the "main set of functionalities" contemplated by Cellport's U.S. Patent 6,377,825 (the "'825 Patent") and that it did not fall within the scope of European Patent EP 1266456 (the "'456 Patent") because it did not "perform audio signal processing." Similarly, the district court refused to grant Cellport royalties for the SIAB because that system did not practice the two asserted claims of U.S. Patent 6,341,218 (the "'218 Patent").

Having concluded that Peiker owed Cellport royalties on two of the seven products, the district court awarded Cellport pre-judgment interest at the statutory rate, rather than the 1.5% per month rate that Cellport sought pursuant to the License Agreement. Cellport was awarded $613,443. The district court exercised its discretion not to award costs, determining that neither party was the prevailing party as described in the License Agreement.

To the extent the district court found in favor of Peiker, Cellport appeals.[3] Peiker cross-appeals, challenging the district court's conclusion that its royalty obligations did not depend on a potential revocation of the '456 Patent.

**II**

**A**

---

[3] The resolution regarding the CKII and CKIV Pockets sold to Daimler is not at issue on appeal.

- 6 -

We must first address Peiker's motion to transfer this appeal to the United States Court of Appeals for the Federal Circuit or, in the alternative, to dismiss it. Peiker argues that Cellport's right to relief necessarily depends on the resolution of a substantial, disputed question of patent law, and thus 28 U.S.C. § 1295(a)(1) gives the Federal Circuit exclusive jurisdiction. Although § 1295 was amended in 2011, the parties agree that the superseded pre-amendment version applies in the present matter. That version vests the Federal Circuit with exclusive jurisdiction "of an appeal from a final decision of a district court of the United States, . . . if the jurisdiction of that court was based, in whole or in part, on section 1338 of this title." In turn, § 1338(a) confers on the district courts exclusive jurisdiction over "any civil action arising under any Act of Congress relating to patents."

"It is our obligation always to be certain of our subject matter jurisdiction." Russo v. Ballard Med. Prods., 550 F.3d 1004, 1009 (10th Cir. 2008). Section 1338(a) jurisdiction extends

> only to those cases in which a well-pleaded complaint establishes either that federal patent law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims.

Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 809 (1988). "[A] claim supported by alternative theories in the complaint may not form the basis for § 1338(a)

- 7 -

jurisdiction unless patent law is essential to each of those theories." Russo, 550 F.3d at 1009-10 (quotation omitted).[4]

Cellport's complaint states claims based on contract law, not patent law. Thus, the district court had jurisdiction pursuant to § 1338(a)—and the Federal Circuit has exclusive jurisdiction over this appeal—only if Cellport's "right to relief necessarily depends on resolution of a substantial question of federal patent law." Christianson, 486 U.S. at 809. Peiker contends that the Federal Circuit has exclusive jurisdiction because the License Agreement "expresses the parties' intent to tie Peiker's license and royalty obligation to Cellport's patents, and the determination of whether a product is a Licensed Product (and thus requires payment of a royalty) requires a determination of whether Peiker's products infringe any of Cellport's Licensed Patents."[5] Resolution of the

---

[4] The Federal Circuit looks to constructive amendments to a complaint to determine its jurisdiction. See Chamberlain Grp., Inc. v. Skylink Techs., Inc., 381 F.3d 1178, 1189 (Fed. Cir. 2004); see also Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc., 535 U.S. 826, 829 n.1 (2002) (noting, but not deciding, issue of "whether the Federal Circuit's jurisdiction is fixed with reference to the complaint as initially filed or whether an actual or constructive amendment to the complaint raising a patent-law claim can provide the foundation for the Federal Circuit's jurisdiction"). Because Cellport contended throughout trial that its claims sounded in contract, we conclude that no constructive amendment occurred. We therefore avoid reaching the issue of whether Federal Circuit jurisdiction can be based on constructive amendment of a complaint.

[5] Licensed Patents are defined by reference to a list of "patents and other rights" included in a schedule to the License Agreement. Licensed Products are:

> any of Universal Mobile Connectivity Products, Uniphones, Docking Stations and Pockets. Licensed Products may incorporate Peiker Intellectual Property and other intellectual property as well. It is not necessary that Licensee manufacture, sell, distribute or deliver all of the elements of a system, device or set of components for using portable

jurisdictional issue depends, according to Peiker, on the proper interpretation of sections 1.17(i) and 3.5 of the License Agreement. Those sections, it argues, require Cellport to demonstrate that the products at issue infringe Cellport's patents. By contrast, Cellport contends that the License Agreement does not necessarily require an infringement analysis. We review the district court's interpretation of the contract de novo. Level 3 Commc'ns, LLC v. Liebert Corp., 535 F.3d 1146, 1154 (10th Cir. 2008).

Sections 1.17(i) and 3.5 both contain acknowledgments by the parties. In subsection 1.17(i), the "parties acknowledge" that certain items "utilize technology, designs or architectures covered by one or more of the claims included in the Licensed Patents." Similarly, in section 3.5, Peiker "acknowledges that" the described products— "and any substantially similar products and components"—are "Licensed Products, the manufacture, sale, distribution or delivery of which would infringe one or more claims of the Licensed Patents, and that Royalties are due in respect of any manufacture, sale, distribution or delivery of said Licensed Products by" Peiker. The district court concluded that the meanings of sections 1.17 and 3.5 are "arguably" ambiguous, and suggested that subsection 1.17(i) failed to "explicitly and clearly state" that the acknowledgment "could not be challenged." Construing "subsection 1.17(i) as creating what in substance is a rebuttable presumption," the district court concluded that if a product fits within the terms of sections 1.17(i) or 3.5, "it is presumed . . . it is a Licensed Product," but Peiker could "attempt to rebut the presumption by presenting evidence that

wireless devices in vehicles, for any of such elements manufactured, sold, distributed or delivered by it to be a Licensed Product hereunder.

a given product does not in fact use any technology covered by a Licensed Patent and does not infringe a Licensed Patent."

Royalties from a license agreement do not need to be based on the actual use of a patent, and can be dictated by the "convenience of the parties." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 138 (1969). Peiker argues that because the License Agreement says that the royalty payments are "in consideration for [Peiker's] rights under the several patents included in Licensed Patents," royalty payments can only be due on products that actually infringe Cellport's patents. But that language does not prevent the parties from agreeing that a royalty is due on a non-infringing product if doing so would benefit the "convenience of the parties." And we do not see anything in the License Agreement that can transform Peiker's acknowledgments to rebuttable presumptions. See I Oxford English Dictionary 108 (2d ed. 1989) (defining "acknowledge" as "to recognize or admit as true"). The Colorado Supreme Court has held that acknowledgements, when included in a "formal contract," can be "the best kind of evidence."[6] In re Schofield's Estate, 73 P.2d 1381, 1383 (Colo. 1937). Because the parties acknowledged that all products falling within the terms of 1.17(i) "utilize technology, designs, or architectures covered by one or more of the claims included in the Licensed Patents," no infringement analysis is necessary. By its own force, the contract requires Peiker to pay royalties on those products included in sections 1.17(i) and 3.5 of the License Agreement. Thus, Cellport's "right to relief" under sections 1.17(i) and 3.5

---

[6] The parties agree that Colorado law governs their dispute to the extent that federal patent law does not apply.

does not "necessarily depend[] on resolution of a substantial question of federal patent law." Christianson, 486 U.S. at 809. To the extent that Cellport argues other theories in the alternative, its reliance on sections 1.17(i) and 3.5 dictates that patent law is not "essential to each of [Cellport's] theories," Russo, 550 F.3d at 1010 (quotation omitted). The complaint states contract claims, and those claims do not necessarily rely on patent law. We therefore have jurisdiction, and Peiker's motion to dismiss or transfer the appeal is denied.

**B**

Our jurisdictional conclusion concerning sections 1.17(i) and 3.5 necessarily affects our merits decision. Peiker conceded, and the district court concluded, that subsection 1.17(i) applied to the CKII/CIB (Volkswagen). Yet applying its interpretation that the contract created a "rebuttable presumption," the district court determined that the CKII/CIB (Volkswagen) did not infringe Cellport's patents and thus that no royalties were due. Because it found the CKII/CIB (BMW) was "substantially similar" to the Volkswagen product, the court held that royalties were not due on that system either. We have already decided that section 1.17(i) of the License Agreement creates a category of products on which royalties are due regardless of whether any of Cellport's patents are infringed. Thus Peiker owes Cellport royalties on those products because both products fall within the meaning of subsection 1.17(i). Any evidence that Peiker presented to the district court that the products did not infringe Cellport's patents is irrelevant. On remand, the district court should calculate the damages due to Cellport for these two products.

- 11 -

Additionally, the district court did not rule on whether subsection 1.17(i) applied to the CKVI (Audi), concluding simply that the CKVI did not infringe any of Cellport's patents. Again, infringement is irrelevant if a product is covered by the text of 1.17(i). We therefore remand for the district court to consider whether royalties are due on the product under the terms of the contract.

## III

Regarding the BT-PSC, Cellport argues that royalties are due pursuant to subsection 1.17(i) or, alternatively, subsection 1.17(iii).

## A

According to Cellport, the BT-PSC is a Docking Station under the License Agreement, and not, as the district court concluded, a Docking Plate. If the BT-PSC is a Docking Station, then, in combination with a Pocket, it meets the definition of a Universal Mobile Connectivity Product contained in subsection 1.17(i) of the License Agreement as a "Pocket/Docking Station" configuration. By contrast, if the BT-PSC is, as Peiker claims and the district court held, a Docking Plate, the configuration does not trigger subsection 1.17(i). The parties also contest the impact on this analysis of Cellport's admission that a predecessor to the BT-PSC, the Peiker System Connector ("PSC"), is a Docking Plate.

"Docking Plates" and "Docking Stations" are defined in the License Agreement as follows:

> 1.4 <u>Docking Plate</u>. "Docking Plate" means a device or module which is configured to hold a Pocket and establish connectivity between the portable wireless device held by such Pocket and vehicle resources such as power,

- 12 -

audio, antenna and/or other vehicle electronics, either directly or through a Docking Station.

1.5 <u>Docking Station</u>.  "Docking Station" means the components of a Universal Mobile Connectivity Product, which utilizes Pockets, other than the Pocket.  The Docking Station interfaces with vehicle resources, such as power, radio, antenna and/or other vehicle electronics, either directly or otherwise, for example by connecting to a vehicle bus, and also interfaces, either directly or through a Docking Plate, with a Pocket.  When the Docking Station interfaces with the Pocket through a Docking Plate, it is sometimes referred to as a "TCU" or "telematics control unit."

The district court concluded that the BT-PSC "is simply a more modern version of the PSC" which "creates a connection to the cradle or pocket."  Because the BT-PSC "does not provide functionalities for the hands free operation of a phone," the district court determined that "it does not 'interface' with vehicle resources," but only "provides connectivity to vehicle resources."  Thus, the court determined that the BT-PSC is not a Docking Station.

The primary difference between the two defined terms is that a Docking Plate "establish[es] <u>connectivity</u> between the portable wireless device" and "vehicle resources such as power, audio, antenna and/or other vehicle electronics, either directly or through a Docking Station," whereas a Docking Station "<u>interfaces</u> with vehicle resources, such as power, radio, antenna and/or other vehicle electronics, either directly or otherwise" and "also interfaces, either directly or through a Docking Plate, with a Pocket." Concluding that the BT-PSC did not "interface" with vehicle resources because "the BT-PSC does not provide functionalities for the hands free operation of a phone," the district court held that the product is a Docking Plate, not a Docking Station.

Cellport argues that the district court ignored the ordinary meaning of the term "interface." "In the absence of contrary manifestation of intent in the contract itself, contractual terms that have a generally prevailing meaning will be interpreted according to that meaning." Pepcol Mfg. Co. v. Denver Union Corp., 687 P.2d 1310, 1313-14 (Colo. 1984). Within the context of the agreement, however, a Docking Plate must be different from a Docking Station—they are defined separately, can be used in combination, and incur different royalty obligations. Thus, "interfac[ing] with vehicle resources," cannot mean the same thing as "establish[ing] connectivity." See Fibreglas Fabricators, Inc. v. Kylberg, 799 P.2d 371, 377 (Colo. 1990) (en banc) ("The principles guiding our construction of the . . . agreement require that we give effect to each part of the agreement that is capable of rational meaning."). But see VII Oxford English Dictionary 1101 (2d ed. 1989) (defining "interface" as "[t]o connect (scientific equipment) with or to so as to make possible joint operation" and "[t]o come into interaction with").

"When an ambiguity is found to exist and cannot be resolved by reference to other contractual provisions, extrinsic evidence must be considered by the trial court in order to determine the mutual intent of the parties at the time of contracting." Pepcol Mfg. Co., 687 P.2d at 1314. "This extrinsic evidence may include any pertinent circumstances attendant upon the transaction, including the conduct of the parties under the agreement." Id. The district court noted that "Cellport has never claimed that Peiker owed royalties on the PSC," the predecessor to the BT-PSC. Because the shift to the BT-PSC "did not make a difference in the functionality of the system," it concluded that the parties' course

- 14 -

of conduct indicated the BT-PSC fell outside the scope of subsection 1.17(i). We cannot conclude that the district court's factual findings are clearly erroneous, and agree that the conduct of the parties clarifies that the term "interface," as used in the License Agreement, requires more than the functionalities provided by the PSC and BT-PSC.

**B**

Royalties are also due, Cellport contends, under subsection 1.17(iii) of the License Agreement because the BT-PSC infringes the '456 Patent. In particular, Cellport argues that the district court improperly confined the meaning of the term "signal processing" based on examples in the patent specifications.[7] The district court concluded that the BT-PSC "does not perform audio signal processing, ie., 'signal processing functions' such as echo cancellation, frequency equalization and noise reduction."

"Claim construction is an issue of law we review de novo. . . . On the other hand, the determination as to whether the claims, as properly construed, read on the accused

[7] Peiker contends that Cellport's argument regarding the interpretation of "signal processing functions" in the '456 Patent has been waived because Cellport cannot raise a new claim construction dispute after trial. See Conoco, Inc. v. Energy & Envtl. Int'l, L.C., 460 F.3d 1349, 1359 (Fed. Cir. 2006) ("[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial."). Cellport did not request construction of the term below. If a party fails to request construction of a claim, it "implicitly concede[s] that the meaning of the terms" in the claim "are clear and not in need of construction." Eli Lilly & Co. v. Aradigm Corp., 376 F.3d 1352, 1360 (Fed. Cir. 2004). Cellport asserts that "it is not arguing that the claim needs to be construed at all," but rather that the district court made an error of law and deviated from the plain language of the patent. The Federal Circuit in Conoco proceeded to review the construction of a term de novo even after a party "waived its right to have that term construed" because the district court "explicitly construed the term." 460 F.3d at 1359. Similarly, in the present matter the district court defined "signal processing functions" as "audio signal processing." We therefore review the arguments de novo.

The district court also determined that the BT-PSC did "not practice the '825" Patent. That conclusion has not been appealed.

- 15 -

device presents an issue of fact which, following a bench trial, we review for clear error."

JVW Enters., Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1329 (Fed. Cir. 2005)

(quotation omitted).  Courts

> do not import limitations into claims from examples or embodiments
> appearing only in a patent's written description, even when a specification
> describes very specific embodiments of the invention or even describes
> only a single embodiment, unless the specification makes clear that the
> patentee . . . intends for the claims and the embodiments in the specification
> to be strictly coextensive.

Id. at 1335 (quotation omitted).  Nonetheless, the Federal Circuit has "long emphasized

the importance of the specification in claim construction."  Phillips v. AWH Corp., 415

F.3d 1303, 1315 (Fed. Cir. 2005) (en banc).  "We cannot look at the ordinary meaning of

the term . . . in a vacuum.  Rather, we must look at the ordinary meaning in the context of

the written description and the prosecution history."  Medrad, Inc. v. MRI Devices Corp.,

401 F.3d 1313, 1319 (Fed. Cir. 2005) (quotation omitted).  "[T]here is sometimes a fine

line between reading a claim in light of the specification, and reading a limitation into the

claim from the specification."  Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp.,

Inc., 262 F.3d 1258, 1270 (Fed. Cir. 2001) (quotation omitted).  Moreover, "[o]ther

claims of the patent in question, both asserted and unasserted, can also be valuable

sources of enlightenment as to the meaning of a claim term."  Phillips, 415 F.3d at 1314.

We agree with the district court that both of the independent claims identified by

Cellport from the '456 Patent require an interface module that performs signal processing

functions.  Although neither claim defines "signal processing functions," examples of

"signal processing" are elsewhere in the '456 Patent.  For instance, dependent claim 7

claims a system "wherein[] said signal processing functions include substantially removing noise, acoustic echoes and line echoes from audio signals." Such examples correlate with the district court's construction of "signal processing functions" as "audio signal processing." However, the Federal Circuit has "frequently" reiterated that "the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004).

Moreover, although the specifications of the '456 Patent refer to signal processing in multiple instances, and include references to audio functions, such examples do not clearly reflect that they are intended to encompass the breadth of the term "signal processing." See JVW Enters., Inc., 424 F.3d at 1335. To the contrary, the specifications offer "[o]ther potential functions of the interface module digital signal processor," including "interfacing the system to other communication devices, such as personal Information managers (PIMs), GPS receivers, vehicle communications busses, Bluetooth devices, and other devices." Jeffrey Golden, an expert witness called by Peiker, testified that the Bluetooth chip in the BT-PSC performs "a lot of signal processing." Based on this evidence, we cannot agree with the district court that the term "signal processing" refers only to "audio signal processing." We further conclude that the BT-PSC does perform "signal processing functions."

Because the district court only briefly addressed the relationship between the BT-PSC and the '456 Patent, we remand to allow the district court to determine whether—

considering that the BT-PSC performs signal processing functions—the BT-PSC practices the '456 Patent and to calculate, if necessary, the royalties owed to Cellport.[8]

## IV

### A

Raising three arguments regarding the SIAB, Cellport initially contends that the SIAB falls within the meaning of subsection 1.17(i) because it constitutes a Pocket and Docking Station configuration. The district court disagreed, concluding that the "Baseplate" is not a Docking Station, but rather "a phone charger, connecting only to the vehicle's power system and to an external antenna if the vehicle has one." It found that the SIAB is "the functional equivalent of a [U]SB cord plugged into the vehicle's cigarette lighter that charges the phone." Cellport argues that this holding incorrectly determined that a Docking Station must have "processing capability." However, as discussed above, a Docking Station must "interface with vehicle resources," which requires that it do more than "establish connectivity." After reviewing the record, we are not convinced that the district court's factual conclusion that the Baseplate only offers connection to the power system and external antenna was erroneous.

### B

Alternatively, Cellport argues that it is entitled to royalties for the SIAB pursuant to subsection 1.17(iii) of the License Agreement. It contends that subsection 1.17(iii)

---

[8] In its brief, Cellport argues that the phrase "covered by" in subsection 1.17(iii) of the License Agreement does not require an infringement analysis. To the extent the argument applies to the BT-PSC, we reject it for the reasons described below.

does not require an infringement analysis but instead applies if any portion of a claim was featured in a product.

"[I]t is fundamental," the district court said, "that if a product does not infringe a patent, then the patent holder cannot demand royalties." We agree, at least with respect to the language of subsection 1.17(iii), which (unlike subsection 1.17(i)) contains no "acknowledgment" that certain devices utilize covered technology. Substantial authority equates "covered by," the phrase used in subsection 1.17(iii), with infringement. E.g., Jang v. Boston Scientific Corp., 532 F.3d 1330, 1331 (Fed. Cir. 2008) (right to payments depends on whether devices "were 'covered by' (i.e., would have infringed)" patents); 5 Donald S. Chisum, Chisum on Patents § 16.02[2] (2010) ("One making, using or selling matter covered by a patent without authority of the owner infringes regardless of knowledge or intent.").[9]

Although the License Agreement defines "Licensed Patents" to include "patents and other rights listed" in a schedule to the agreement, the definition does not preclude application of a patent infringement analysis. Rather, the referenced schedule lists only patents and patent applications, including "patents issued after the effective date of this Agreement to Cellport and covering the same inventions described in the foregoing

---

[9] Peiker's course of conduct, Cellport contends, reflects that Peiker understood subsection 1.17(iii) not to require proof that a product infringed a patent. See E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co., 109 P.3d 969, 974-75 (Colo. 2005) (course of conduct in contract interpretation). The district court, however, accepted Peiker's testimony that the relevant conduct was premised on Peiker's understanding that the Snap-in Adaptor infringed a claim in the '218 patent that is no longer operative. And the district court noted that Cellport later "seems to have agreed" that the Snap-in Adaptor did not practice the patent and that Peiker did not owe a royalty on the product. The district court's conclusions are supported by the evidence.

patents or patent applications, or improvements or enhancements of the foregoing patents or patent applications." Thus, the "other rights" included in the License Agreement were pending or otherwise potential future patents, to which an infringement analysis conceivably could be applied. Because that analysis is what the language of the License Agreement requires, we do not need to consider whether there is evidence that the SIAB features a portion of any claim from Cellport's patents.

C

In addition to its contract arguments, Cellport argues that the district court erred in its interpretation and application of the '218 Patent. The district court held that the SIAB did not infringe claim 9 of the '218 Patent on two grounds, and we can affirm on either. See Elwell v. Byers, 699 F.3d 1208, 1213 (10th Cir. 2012) ("We can affirm a lower court's ruling on any grounds adequately supported by the record . . . ."). Claim 9 of the '218 Patent specifies that latch members "move from" a "first position to" a "second position to secure said interface module to said pocket member." The district court found "that the Snap-in-Adaptor has a single position that moves and returns to its original position," and that the "latch is in the same position regardless whether the Snap-in-Adaptor is engaged or disengaged."

We are directed to the testimony of two witnesses who stated at trial that the latch members have different positions. But one of the witnesses who so testified did so in contravention of his deposition testimony, in which he had agreed that the latch members are in the same position whether the Snap-in-Adaptor is disengaged or engaged. That witness further testified that he had read the district court's claim construction before

changing his position. The district court also had the opportunity to personally witness the latching mechanism. We cannot conclude that the district court's findings were "without factual support in the record" and, "after reviewing all the evidence," we are not "left with a definite and firm conviction that a mistake has been made." Sw. Stainless, LP v. Sappington, 582 F.3d 1176, 1183 (10th Cir. 2009).

## V

With respect to the pre-judgment interest rate awarded, Cellport challenges the district court's application of a statutory rate instead of the 1.5% figure named in the Licensing Agreement. The relevant section provides as follows:

> 3.4 Audit Rights. At Cellport's request, Licensee shall give an independent auditor, appointed by Cellport, access to all of Licensee's and its Subsidiaries' accounting and other records relevant to this Agreement at least once per calendar year (or more frequently upon Cellport's request if Cellport has reasonable cause to examine such records more frequently) for the purpose of verifying royalty payments due to Cellport. Access to such accounting records shall be given to such auditor upon reasonable notice at a time mutually convenient for the parties hereto. Licensee and its subsidiaries shall cooperate fully with Cellport's and/or its agents reasonable requests in the review of such records. All underpayments of Royalties shall bear interest at the rate of 1.5% per month from the date due to the date paid. Cellport shall bear the expenses of any such audit unless the audit reveals an underpayment to Cellport of greater than 5% of the amount due for any quarter audited, in which case the Licensee shall pay all costs and expenses of the audit.

(Emphasis added.) According to Cellport, the License Agreement's reference to the rate contains no limitations on its application. As the district court explained, however, the sentence is in the middle of a paragraph devoted to Cellport's right to verify the royalty payments it is owed through audits. And we must interpret this provision in its context. Cf. Rohn v. Weld Cnty. Bank, 395 P.2d 1003, 1005 (Colo. 1964) (error to interpret words

in contract "alone and out of context"). We agree with the district court that the interest rate was contractually intended to apply only to accounting disputes. The application of the statutory rate was appropriate.

## VI

Finally, Cellport contends it was error for the district court to deny attorneys' fees, costs, and expenses pursuant to the License Agreement. The License Agreement provides that the "prevailing party" in a suit regarding the agreement "shall be entitled to recover its reasonable attorney's fees, costs and expenses in addition to any other damages." The district court determined that neither party was "[t]he prevailing party" for purposes of the agreement because Cellport prevailed with respect to two of the seven disputed products, and obtained only a small percentage of the damages it sought. We do not disagree. Upon remand, however, the balance will have shifted to some extent, and it may shift further. We therefore remand to the district court to vacate its previous determination and reconsider the award of fees, costs, and expenses given the new terrain in the case.

## VII

We turn now to Peiker's cross-appeal, which challenges the district court's order interpreting the License Agreement to require "the payment of royalties on any sale of products utilizing Cellport's patented technology, wherever the products were made, sold or used, so long as any Licensed patent remains in effect." While the suit was pending in the district court, the '456 Patent was revoked. The revocation is currently suspended because Cellport has sought an appeal. European Patent Convention, Art. (106)(1).

Peiker moved the district court for a ruling that the '456 Patent was "eliminated from this case," and that Cellport's right to royalties is limited to the temporal and territorial scope of the patents at issue. The district court recognized that the appeal regarding the '456 Patent was pending, but nonetheless ruled on the interpretation of the contract, in a manner "consistent with Cellport's position." On appeal, Peiker argues that the district court's ruling should be reversed because "if no Licensed Patent applies to a particular product, Peiker owes no royalty." Cellport replies that Peiker's cross-appeal is not ripe because the appeal regarding the '456 Patent has yet to conclude.

"[T]his court is compelled to assure itself that it has subject matter jurisdiction," and ripeness is a "jurisdictional prerequisite." Friends of Marolt Park v. U.S. Dep't of Transp., 382 F.3d 1088, 1093 (10th Cir. 2004) (quotation omitted). Moreover, "we have an independent duty to ensure that the district court[] properly asserted jurisdiction." Qwest Corp. v. Pub. Utilities Comm'n of Colo., 479 F.3d 1184, 1191 (10th Cir. 2007) (quotation omitted). "The ripeness doctrine aims to prevent courts from entangling themselves in abstract disagreements by avoiding premature adjudication." Awad v. Ziriax, 670 F.3d 1111, 1124 (10th Cir. 2012) (quotation omitted). "[E]ven if all the relevant facts regarding a particular legal issue are known or knowable, a court does not have jurisdiction to resolve the issue unless that issue arises in a specific dispute having real-world consequences." Columbian Fin. Corp. v. BancInsure, Inc., 650 F.3d 1372, 1379 (10th Cir. 2011).

As the district court recognized, Peiker's request for the interpretation (which resulted in a beneficial interpretation for Cellport) was not based on a present conflict.

Peiker asks us to find that the district court's determination was permissible as a pure question of law and suggests that failing to address the issue would impose hardship on Peiker because its ability to challenge the district court's determination would be contingent on action that may not occur until after the litigation is complete.

The Supreme Court has commented on the need "to prevent federal-court litigants from seeking by declaratory judgment to litigate a single issue in a dispute that must await another lawsuit for complete resolution." Calderon v. Ashmus, 523 U.S. 740, 748 (1998). In this case, the legal issue at the heart of the cross-appeal has not "taken on fixed and final shape." Pub. Serv. Comm'n v. Wycoff, 344 U.S. 237, 244 (1952). Peiker argues that a failure to rule on the matter could result in additional litigation, but neither party has demonstrated how the district court's ruling could have any material effect before the end of the '456 Patent appeal. We agree with Cellport that the issue is not ready for appellate review and further hold that it was not ripe for review by the district court. "It is not the role of federal courts to resolve abstract issues of law. Rather, they are to review disputes arising out of specific facts when the resolution of the dispute will have practical consequences to the conduct of the parties." Columbian Fin. Corp., 650 F.3d at 1376. Therefore, we remand the issue to the district court with instructions to vacate its judgment on the matter. See id. at 1385.

## VIII

For the foregoing reasons, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** to the district court for further proceedings consistent with this decision. Peiker's motion to dismiss or transfer the appeal is **DENIED**.