**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 23, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BENJAMIN GRICE and KAYLA
PATCHETT,

       Plaintiffs - Appellants,

v.

CVR ENERGY, INC. and CVR
REFINING, LP,

       Defendants - Appellees,

and

FLOWSERVE CORPORATION;
FLOWSERVE US, INC.; DOUG
RICHISON; and JOHN DOE
ENGINEERING COMPANY,

       Defendants.

No. 17-5079

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 4:16-CV-00459-GKF-FHM)**

---

Michael D. Robbins, Doyle Restrepo Harvin & Robbins, L.L.P. (Michael Patrick
Doyle, Doyle LLP, Houston, Texas, and James Eloi Doyle, Doyle Restrepo Harvin
& Robbins, L.L.P., Houston, Texas, with him on the briefs), Houston, Texas, for
Appellants.

Lee M. Smithyman (Arthur E. Rhodes with him on the brief), Smithyman &
Zakoura, Chartered, Overland Park, Kansas, for Appellees.

---

Before **TYMKOVICH**, Chief Judge, **McKAY**, and **CARSON**, Circuit Judges.

_____

**TYMKOVICH**, Chief Judge.

_____

Benjamin Grice suffered severe burns after an oil pump exploded at the refinery where he worked. He and his wife brought suit against the refinery's two parent corporations, CVR Energy and CVR Refining. They alleged the parent companies assumed responsibility for workplace safety at the oil refinery by entering into a services agreement for the benefit of Grice's employer, Coffeyville Resources. The district court granted summary judgment in favor of the parent companies, concluding that the agreement did not obligate them to provide safety services to the oil refinery.

We first conclude that CVR Refining must be dismissed as a party under 28 U.S.C. § 1332, to preserve complete diversity of citizenship. We then affirm the district court's grant of summary judgment in favor of CVR Energy. The company did not have a duty to Grice to maintain the oil pump since the services agreement was for administrative and legal services and not for safety services that would subject CVR Energy to liability under Kansas law.

## I. Background

Benjamin Grice worked for Coffeyville Resources Refining & Marketing (Coffeyville) as a refinery employee. While he was on shift, a leak sprung in a

-2-

refinery pump, causing flammable hydrocarbons to pool on the unit floor. The hydrocarbons ignited when Grice and three coworkers responded to the leak. The resulting explosion severely burned Grice and killed one of his coworkers.

The cause of the leak and explosion is undisputed. Excessive wear and tear allowed the pump's rotating parts to contact and shatter the pump's seal. It is also undisputed that a double mechanical seal would have prevented the leakage of flammable hydrocarbons. Coffeyville had commissioned a Process Hazard Analysis study before the accident that recommended an upgrade from a single to a double mechanical seal, and the company had scheduled to replace and upgrade the seals sometime after the accident occurred.

Grice received workers' compensation benefits for his injuries, extinguishing any civil claims against Coffeyville. Grice and his wife then filed tort claims against Coffeyville's two parent corporations—CVR Energy and CVR Refining. CVR Energy indirectly owns sixty-six percent of CVR Refining, which in turn indirectly owns one-hundred percent of Coffeyville.

The Grices argued to the district court that CVR Energy assumed responsibility for workplace safety by entering into a services agreement with CVR Refining. CVR Energy and CVR Refining executed the agreement in 2012 for the benefit of the two parties' six mutual subsidiaries engaged in the business of refining and transporting oil, including Coffeyville. The services CVR Energy

-3-

was to perform for these six subsidiaries included providing "safety and environmental advice" and managing the subsidiaries' "day-to-day business and operations." App. 191. Included within those enumerated services, according to the Grices' interpretation of the agreement, was the obligation to ensure workplace safety by maintaining refinery equipment.

Following discovery, both parties filed motions for summary judgment. The district court denied the Grices' motion, noting there existed genuine issues of material fact. The court concluded that there were questions as to "(1) whether the parties intended the Services Agreement as a safety services contract or cost-allocation mechanism; and (2) if a safety services contract was intended, the scope and nature of the duties owed by CVR Energy to Coffeyville employees." *Grice v. CVR Energy, Inc.*, No. 16-CV-459-GKF-FHM, 2017 WL 1100906, at *4 (N.D. Okla. Mar. 23, 2017). But the district court later reversed course and granted CVR Energy and CVR Refining's motion for summary judgment after further considering extrinsic evidence. The court concluded the agreement was best read "to provide a cost-allocation mechanism for shared services," *Grice v. CVR Energy, Inc.*, No. 16-CV-459-GKF-FHM, 2017 WL 3032221, at *5 (N.D. Okla. July 17, 2017), and therefore CVR Energy was not responsible for Grice's injuries.

-4-

## II. Jurisdiction

We must first determine our jurisdiction in this diversity matter. When our jurisdiction relies solely on diversity of citizenship under 28 U.S.C. § 1332, each defendant must be diverse from each plaintiff. *See, e.g.*, *Ravenswood Inv. Co., L.P. v. Avalon Corr. Servs.*, 651 F.3d 1219, 1223 (10th Cir. 2011). The parties concede that the case lacked complete diversity when the complaint was filed because CVR Refining had unitholders in Kansas (the resident state of the Grices), a disclosure not revealed until this appeal was pending. There is no dispute, therefore, that the district court was without jurisdiction to rule on the merits of the case.

But this fact does not necessarily divest our court of jurisdiction. The Supreme Court has clarified that appellate courts may cure this type of jurisdictional defect by dismissing a jurisdiction-spoiling dispensable party on appeal. *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 827 (1989). We exercise this authority here because we find that CVR Refining is a dispensable party.

CVR Refining submitted its diversity-jurisdiction disclosure statement during the briefing stage, as required under Tenth Circuit Local Rule 26.1(A), "identifying its members and their states of citizenship." The company stated only that "common units are owned by thousands of public unitholders." Supp.

Disclosure Statement (filed Apr. 6, 2018). In response, the Grices filed a Notice

of Potential Noncompliance. Notice (filed Apr. 24, 2018). They asserted that

master limited partnerships, like CVR Refining, are citizens in every state in

which a unitholder resides. *See Grynberg v. Kinder Moran Energy Partners,*

*L.P.*, 805 F.3d 901, 905 (10th Cir. 2015). This would require CVR Refining to

disclose the citizenship of all its unitholders.

CVR Refining conceded in response that the case lacked complete diversity

under *Grynberg* because, "given the number of public unitholders, the existence

of Kansas and Oklahoma unitholders is almost certain." Response to Notice

(filed May 9, 2018). We must therefore assume that CVR Refining's presence in

this case destroys diversity jurisdiction.

We may restore complete diversity among the parties, however, if CVR

Refining is a dispensable party under Rule 19 of the Federal Rules of Civil

Procedure. *See Newman-Green*, 490 U.S. at 827–29. Under Rule 19, a party is an

indispensable party if (1) "in that person's absence, the court cannot accord

complete relief among existing parties" or (2) proceeding without that party

would "impair or impede the person's ability to protect [an] interest" or "leave an

existing party subject to a substantial risk of incurring double, multiple, or

otherwise inconsistent obligations because of the interest." Fed. R. Civ. P. 19.

The inquiry, in other words, is mainly one of prejudice. *See Ravenswood Inv.*

*Co.*, 651 F.3d at 1225. If "one or more parties will be unfairly prejudiced by dismissing" a defendant, the "court must dismiss the case in its entirety for lack of jurisdiction." *Id.* at 1226.

We conclude that no party will be unfairly prejudiced if we dismiss CVR Refining and reach the merits of this case. CVR Energy maintains it will not suffer prejudice if this court dismisses CVR Refining. And the Grices conceded at oral argument that they also would not be prejudiced. This is because dismissing CVR Refining does not deny the Grices a legal forum. They are free to refile their claims against the dismissed party in state court, putting them in the same situation (of needing to refile) as if this court dismissed the case entirely for lack of jurisdiction.

We note that we dismiss CVR Refining on appeal only because the party is clearly a dispensable party. Ordinarily we would remand to the district court to make this determination because, as the Supreme Court indicated, when factual disputes arise the district court is "in a better position to make the prejudice determination" under Rule 19. *Newman-Green*, 490 U.S. at 838. Further, the *Newman-Green* Court tells us to exercise our authority to dismiss jurisdiction-spoiling parties "sparingly." *Id.*

We therefore dismiss CVR Refining advisedly, doing so because neither party has identified a factual dispute nor argued that the remaining parties would suffer unfair prejudice if we reach the merits of the appeal.

## III. Analysis

The Grices challenge the district court's summary judgment determination that CVR Energy owed no duty to Grice. The district court concluded the Services Agreement was merely a cost-allocation mechanism, not an agreement whereby CVR Energy assumed responsibility for workplace safety at Coffeyville. We review this grant of summary judgment de novo, "applying the same standard as the district court." *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1246 (10th Cir. 2010). We apply Kansas tort law to this case, which arises in diversity.[1]

### A. Assumption of Duty to Third Parties

The Grices sue under a theory of assumption of liability. Under this theory a person or entity voluntarily assumes a duty to a third party and therefore liability for harm resulting from a failure to exercise reasonable care. *See*

---

[1] We apply Kansas law despite this case arising out of the Northern District of Oklahoma. The district court applied Kansas law, likely because the accident occurred in Kansas. The Grices do not challenge this determination as error, merely suggesting that the law of Kansas does not differ in any material respect from that of Oklahoma and Texas, as these states have all adopted the Second Restatement of Torts. We therefore do not perform a choice-of-law analysis.

*Schmeck v. Shawnee*, 651 P.2d 585, 597 (Kan. 1982). The Grices contend that CVR Energy assumed this liability through the Services Agreement whereby the company assumed responsibility for maintaining safe work sites on the premises of its subsidiaries.

CVR Energy has liability only to the extent it voluntarily assumed a duty to Grice because a parent corporation is not ordinarily liable for the negligence of its independent subsidiary. *See Birmingham v. Experian Info. Sols., Inc.*, 633 F.3d 1006, 1018 (10th Cir. 2011) ("A subsidiary corporation is presumed to be a separate and distinct entity from its parent corporation.") (citation omitted). As the Supreme Court has noted, "[i]t is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citation omitted).

But under Kansas law an exception exists. Kansas has adopted the Second Restatement of Torts, and under the Restatement a parent can be responsible for the acts of its subsidiary in certain circumstances. The Second Restatement establishes that "[o]ne who undertakes, gratuitously or for consideration, to render services to another . . . is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care" if "he has undertaken to perform a duty owed by the other to the third person."

RESTATEMENT (SECOND) OF TORTS § 324A. Kansas has specifically adopted this standard, and "the principles embodied in § 324A [of the Restatement] have long been recognized by" Kansas courts. *Schmeck*, 651 P.2d at 597. Kansas law thus requires the Grices to demonstrate that CVR Energy took "affirmative action that could be construed as an intentional undertaking" to render comprehensive workplace-safety services to Coffeyville. *See Gooch v. Bethel A.M.E. Church*, 792 P.2d 993, 998 (Kan. 1990); *see also Hauptman v. WMC, Inc.*, 224 P.3d 1175, 1192 (Kan. Ct. App. 2010) (noting that "the evidence must show the defendant did more than act, but through affirmative action assumed an obligation").

The Grices contend the Services Agreement unambiguously proves CVR Energy "affirmatively undertook duties that were necessary to protect Grice from harm." Aplt. Br. at 26. If this were true, the Services Agreement would be a sufficient undertaking because a duty under § 324A may arise from a contractual undertaking. *See Cessna Aircraft Co. v. Metro Topeka Airport Auth.*, 940 P.2d 84, 92 (Kan. Ct. App. 1997). We disagree with the Grices' reading of the Services Agreement, however.

*B. Characterization of the Services Agreement*

The Grices first argue the Services Agreement required CVR Energy to provide comprehensive safety services to Coffeyville and functioned not as a mere cost-allocation agreement. They point to the many *services* the agreement

obligated CVR Energy to perform, such as providing "safety and environmental advice," managing Coffeyville's "day-to-day business and operations," and managing the subsidiary's "property and assets in the ordinary course of business." App. 191. These, the Grices argue, are not the type of services a cost-allocation agreement contemplates or a parent corporation ordinarily performs for a subsidiary. The district court disagreed, finding the agreement was a mere cost-allocation mechanism.

The Grices also argue the Services Agreement cannot be a cost-allocation mechanism because the agreement expressly characterizes CVR Energy "as an independent contractor." *Id.* at 179. Moreover, the Grices presented evidence to the district court that the defendants held the agreement out to the SEC as more than a cost-allocation agreement. Their expert explained that CVR Refining chose to disclose the agreement in SEC filings and, had the agreement been "[a] mere cost or accounting allocation protocol," the agreement "would not be disclosed as a material contract under SEC Regulation S-K." *Id.* at 430, 831–33. In the Grices' view, CVR Refining "held out to the investing public that CV[R Energy] was under a duty to perform the Services in the Agreement, so the public would have relied on the fact that CVR Energy would be 'conduct[ing] a substantial portion of [Coffeyville's] day-to-day business operations.'" Aplt. Br. 19.

CVR Energy counters with provisions from the agreement that indicate the parties were merely attempting to allocate costs. For instance, the Services Agreement contemplates that the parties would share executive personnel. CVR Energy was to provide "services in capacities equivalent to capacities of corporate executive officers, except that the persons serving in such capacities shall serve in such capacities as Shared Personnel." App. 191. The agreement also described how the parties would share (pro rata) all office costs, some insurance premiums, "services provided by outside vendors," and "depreciation and amortization." *Id.* at 167. This suggests that the Services Agreement merely created a system where CVR Energy and its subsidiaries would share in the costs of operating the businesses.

Despite the parties' insistence on these points, however, neither position is dispositive. Even if the agreement is a classic contract for services—a view for which there is some supporting evidence—the real question is one of contract interpretation. The inquiry is whether workplace safety is one of the "services" the agreement obligated CVR Energy to perform. This is because § 324A supports liability only when a person assumes a duty to render specific services. And it is axiomatic that not every services agreement requires the obligor to assume responsibility over the entirety of the obligee's operations, just as not every independent contractor assumes full responsibility. The scope of the

-12-

services set out within the four corners of the contract, therefore, will determine the entirety of CVR Energy's obligations and liability. *See Honeycutt v. City of Wichita*, 836 P.2d 1128, 1137 (Kan. 1992) ("The extent of the undertaking should define the scope of the duty.").

*C. Language of the Services Agreement*

With these principles in mind, we turn to the language of the Services Agreement. The Grices highlight several phrases in the agreement that suggest CVR Energy assumed responsibility for large portions of its subsidiaries' operations. The agreement states that "CVR is willing to undertake . . . to provide services necessary to operate the business conducted by the Refining Subs." App. 161. These contractual obligations include "[s]afety and environmental advice," management of Coffeyville's "day-to-day business and operations," and management of the subsidiary's "property and assets." *Id.* at 191.

These provisions are not, however, the unequivocal descriptions the Grices contend. Granted, CVR Energy did agree to "[m]anage the Services Recipients' day-to-day business and operations," *id.*, which without further context might strongly support the Grices' interpretation. The phrase "day-to-day business and operations" taken in isolation suggests that CVR Energy was obligated to run the whole show, which undoubtedly includes workplace safety at a business such as

-13-

an oil refinery. And CVR Energy did provide safety services, at least in the form of "[s]afety and environmental advice." *Id.*

But these provisions—without context—are vague at a minimum. There is little hint regarding the scope and nature of the management services or the safety advice. One plausible interpretation of "management," for instance, suggests top-to-bottom control over a business. Management could also refer to overseeing projects from a high level and ensuring projects generally unfold in a certain way. And "business and operations" could refer to administrative or organizational services rather than maintenance or inspections.

Another provision with almost identical language sharpens this ambiguity. One part of the agreement requires CVR Energy to manage its subsidiaries' "day-to-day business and operations," while another provision notes that "[p]ersonnel performing the actual *day-to-day business and operations* of the Refining Subs at the refinery or operating level will be employed by the Refining Subs." *Id.* at 167 (emphasis added)**.** So the agreement simultaneously requires CVR Energy to manage "the day-to-day business and operations" while noting that Coffeyville personnel will perform "the *actual* day-to-day business and operations."

These ambiguities highlight the necessity of considering each provision in light of the entire agreement. *See Cellport Sys., Inc. v. Peiker Acustic GMGH & Co. KG*, 762 F.3d 1016, 1029 (10th Cir. 2014) (noting that it is "error to interpret

-14-

words in [a] contract 'alone and out of context'") (citation omitted). And when we interpret the contractual provisions in context, the scope of the phrases "day-to-day business and operations" and "assets and property" comes into clear focus, foreclosing the Grices' interpretation.

For instance, immediately following the phrase "day-to-day business and operations," the agreement clarifies that these services include "managing [Coffeyville's] liquidity and capital resources and compliance with applicable law." App. 191. This suggests that "business and operations" carries its narrower connotation because courts should interpret terms in light of the characteristics of associated terms. *See* Antonin Scalia & Bryan A. Garner, Reading Law: The interpretation of Legal Texts 197–98 (2012) (explaining the *noscitur a sociis* canon). In this case, the associated terms are the specific services (managing liquidity and compliance with the law) following the general phrase (managing "business and operations").

CVR Energy's obligations are further clarified by the Services Agreement's reference to many high-level administrative services and, more persuasively, its total lack of reference to maintenance- or inspection-type services. The agreement, for instance, requires CVR Energy to provide "administrative and professional services, including legal, accounting, human resources, insurance, tax, credit, finance, government affairs, and regulatory affairs." App. 191. The

-15-

Services Agreement also requires CVR Energy to "establish[] and maintain[] books and records"; recommend "capital raising activities, . . . structured financings or other capital market transactions"; recommend "third party services providers" such as "accountants, lawyers or experts"; "manage or oversee litigation, administrative or regulatory proceedings, investigations or any other review of the Services Recipients' business or operations"; "establish and maintain appropriate insurance policies"; and recommend "the payment of dividends or other distributions on the equity interests of the Services Recipients." *Id.*

The Services Agreement also states that CVR Energy would provide "[s]afety and environmental advice" to its subsidiaries. *Id.* There would be no reason to give safety advice to Coffeyville if CVR Energy was ultimately responsible for workplace safety from the ground up. If that were the case, CVR Energy would be implementing safety procedures and ordering inspections—not advising Coffeyville to do so. This suggests a level of control over the safety operations similar to ordinary parental oversight in managing the business and operations of its subsidiaries.

In sum, none of the enumerated services prompts us to interpret "day-to-day business and operations" in its broadest sense. No specifically listed service, in other words, even remotely resembles services such as maintenance, inspections,

or general workplace safety. All the enumerated services are administrative or legal in nature. So we must interpret CVR Energy's obligation to provide management of Coffeyville's "business and operations" and "assets and property" parallel to its obligations under the more specifically enumerated services. *Cf. United States v. Rowland*, 826 F.3d 100, 109 (2d Cir. 2016) (Courts should "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving [it] unintended breadth").

*D. Extrinsic Evidence*

We could affirm the district court based on the language of the Services Agreement without resorting to extrinsic evidence. But the manner in which the parties treated the agreement also supports the district court's interpretation of the agreement. The Grices have failed to present any evidence that CVR Energy, CVR Refining, or Coffeyville treated the agreement as one obligating CVR Energy to provide comprehensive safety services.

CVR Refining's Chief Financial Officer indicated that her understanding was always that CVR Energy's obligation to manage day-to-day business and operations was limited to administrative tasks such as paying bills, tracking invoices, allocating insurance payments for subsidiaries, and accounting support. And the CFO's understanding seems to be the general understanding, at least regarding safety issues.

-17-

Undisputed evidence CVR Energy submitted by affidavit and deposition testimony supports this conclusion. As the district court explained, the record contains no evidence that CVR Energy was directly involved in ensuring safety or proper maintenance: "In simplest terms, [Coffeyville] 'had its own safety program and . . . director over which [CVR] had no direct authority.' Coffeyville owned and operated refinery property and machinery; had its own safety department, manager, and personnel; and conducted its own inspections and repairs." *Grice*, 2017 WL 3032221, at *3. Moreover, no record evidence suggests that a CVR Energy employee reviewed the 2010 Process Hazard Analysis, the study Coffeyville managers commissioned that recommended double seals on refinery pumps. And in the five years preceding the accident, no CVR Energy employee entered, inspected, or reviewed the isomerization unit, the pump, or the isomerization equipment. Coffeyville's engineers and safety department performed all these tasks, and Coffeyville—not CVR Energy—set the schedule for when updates such as the conversion to double seals would occur.

The only evidence the Grices have presented to rebut CVR Energy's showing is that corporate executives had a daily phone call with Coffeyville regarding safety, the company tracked open and past-due maintenance projects, and approved the budget for maintenance projects. As the district court noted, "To be sure, CVR offered strategic direction, developed general safety policies,

-18-

offered technical support, and monitored compliance with general OSHA safety regulations." *Grice*, 2017 WL 303221, at *3.  The Grices' proffered evidence might demonstrate that the agreement was more than a cost-allocation mechanism. But it does not rebut CVR Energy's showing that the company merely oversaw Coffeyville's operations from a high level, consistent with the language of the Services Agreement.

The Grices needed to proffer more to survive summary judgment.  All the Grices can show from the record is that CVR Energy gave advice and monitored the progress of safety issues.  And this is insufficient because "[t]he extent of the undertaking should define the scope of the duty."  *Honeycutt*, 836 P.2d at 1137. The extrinsic evidence, therefore, supports the district court's interpretation of the contract. The Services Agreement was one for oversight and administrative services, so CVR Energy did not assume a duty to Grice by undertaking to provide comprehensive safety services to Coffeyville.

# IV. Conclusion

CVR Energy did not assume a duty to provide workplace safety for employees of its subsidiaries.  We therefore AFFIRM the decision of the district court granting summary judgment to CVR Energy.[2]

---

[2] We also deny the Grices' Motion for Leave to File a Reply to CVR Refining's Response to Appellants' Notice of Potential Non-Compliance.